UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| REX GARD,<br><br>Plaintiff,<br><br>vs.<br><br>**BOB DOOLEY**, CHIEF WARDEN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; **SUSAN JACOBS**, ASSOCIATE WARDEN, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; **MURIEL NAMMINGAA**, LAUNDRY SUPERVISOR, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; **ANDRA GATES**, SUPERVISOR, DOH, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; **KELLY SWANSON**, SUPERVISOR, DOH, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; **JENIFER BEMBOOM**, CBM FOOD SERVICE, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; **JOHN TREWIELLAR**, CBM FOOD SERVICE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; **BARRY SCHROETER**, CBM FOOD SERVICE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; **JENIFER STANWICK**, DEPUTY WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; **REBECCA SCHEIFFER**, ASSOCIATE WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; **LELAND TJEERDSMA,** MAJOR, INDIVIDUAL AND OFFICIAL CAPACITY; **TRAVIS TJEERDSMA,** UNIT STAFF, INDIVIDUAL AND OFFICIAL CAPACITY; **TAMMY DEJONG**, UNIT STAFF, INDIVIDUAL AND OFFICIAL CAPACITY; **RANDY STEVENS**, PROPERTY OFFICER, INDIVIDUAL AND OFFICIAL CAPACITY; **CORPORAL CROPPER**, CORPORAL, INDIVIDUAL AND OFFICIAL CAPACITY; **RANDY MILNE**, CORRECTIONS OFFICER, | 4:14-CV-04023-LLP<br><br><br><br>REPORT AND RECOMMENDATION [DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DOCKET 86] |

INDIVIDUAL AND OFFICIAL
CAPACITY; **JESSICA LUKE**, OFFICE
STAFF, DOH, INDIVIDUAL AND
OFFICIAL CAPACITY;  DOC STAFF,
UNKNOWN AT THIS TIME,
INDIVIDUAL AND OFFICIAL
CAPACITY; AND  **CBM FOOD
SERVICES EMPLOYEES**, UNKNOWN
AT THIS TIME, INDIVIDUAL AND
OFFICIAL CAPACITY;

Defendants.

## INTRODUCTION

This matter is before the court on plaintiff Rex Gard's amended

complaint pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities

Act ("ADA"), 42 U.S.C. §§ 12131 – 12165.  See Docket No. 55.[1]  The district

court, the Honorable Lawrence L. Piersol, referred this matter to this

magistrate judge for the resolution of non-dispositive motions and for

recommended dispositions on dispositive motions.  This referral was made

pursuant to 28 U.S.C. § 636(b)(1) and the October 16, 2014, standing order of

the Honorable Karen E. Schreier, district court judge.  Pending is the

defendants' motion for summary judgment.[2]

---

[1]      Mr. Gard's original complaint (Docket 1) was filed on February 13, 2014.
He filed his amended complaint (Docket 55) on November 25, 2014 after the
court  granted him permission to do so.

[2]      The defendants have moved for summary judgment and filed supporting
documents (Docket 86 and Docket 88 through 88-83).  At the court's order, the
defendants later filed a copy of the entirety of Mr. Gard's institutional medical
file under seal.  See Docket entry dated January 4, 2016 and Docket 133.

## BACKGROUND

The background of the instant lawsuit is that Mr. Gard, an inmate at a South Dakota state prison, alleges defendants failed to give him special diabetic socks and diabetic shoes, which were necessitated  by Mr. Gard's medical condition—insulin-dependent diabetes.  He also alleges defendants have failed to provide him with a diabetic diet.  Mr. Gard also alleges he needs prescription glasses but defendants have failed to give him a pair of glasses that fit his head.  Each of these allegations form the basis for Mr. Gard's assertion that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. See Docket No. 1 at pp. 2-8.

In addition, Mr. Gard alleges defendants violated Title II of the ADA by refusing to give him a specialized diet, denying him access to particular religious ceremonies, the law library, the day hall, the recreation yard, and the restrooms.  See Docket No. 1 at p. 9. The district court screened Mr. Gard's complaint and found Mr. Gard's complaint set forth claims sufficient to survive initial scrutiny under 28 U.S.C. § 1915.  See Docket No. 11.  The court ordered the complaint and summonses to be served on defendants.  Defendants then duly filed an answer.  See Docket No. 27.

---

After several extensions of time, Mr. Gard filed his resistance to the defendants' motion for summary judgment.  See Docket 129, 130, 131.  The defendants did not file a reply brief.

On July 2, 2014, Mr. Gard moved to file an amended complaint, and the district court granted the motion.  Docket 34 & 44.  Mr. Gard moved for extra time to file his amended complaint (Docket 45) and the district court granted that motion as well (Docket 46).  Mr. Gard filed yet another motion for an extension of time to file his amended complaint (Docket 50), and the district court granted the motion (Docket 53).  Mr. Gard filed the amended complaint (Docket 55) on November 25, 2014.   His amended complaint re-alleged his § 1983 deliberate indifference and ADA claims based upon Mr. Gard's diabetic condition, (Docket 55, ¶¶ 24-84) and added claims based upon what Mr. Gard perceives to be the defendants' retaliatory conduct which has occurred since the date Mr. Gard filed his original complaint.  Docket 55, ¶¶ 85-114.

On April 7, 2015, the defendants moved for summary judgment on all claims which are based upon 42 U.S.C. § 1983.  See Docket 86, 87 & 88.[3]  The defendants assert that as to each of Mr. Gard's claims based upon § 1983, they are entitled to qualified immunity.  See Docket 88.  Mr. Gard moved for several extensions of time to respond to the defendants' motion for summary judgment, (see Docket Nos. 91, 93, 119) and this court granted each motion.  See text order following Docket No.91, Docket No. 95, and Docket No. 120.  The order granting Mr. Gard's final motion to extend cautioned, however, that no

---

[3]      The defendants did not move for summary judgment on Mr. Gard's claims which are based upon the Americans with Disabilities Act.  Those claims, therefore, are unaffected by this report and recommendation.

4

further motions to extend would be granted and his response must be filed by December 30, 2015.  Docket 120.

Mr. Gard filed a flurry of other motions following the defendants' motion for summary judgment.  This court ruled on those motions, which resulted in an order to the defendants to produce all of Mr. Gard's medical records to him. See Docket 128.  Despite its earlier admonition that no further extensions would be granted, the court allowed Mr. Gard more time to respond after his voluminous institutional medical records were produced.  Mr. Gard nevertheless submitted his response by December 31, 2015.  Docket 129.[4]  The time for his additional response has now passed.  The defendants failed to submit a reply brief and this matter is finally ripe for decision.

## DISCUSSION

### A.   Mr. Gard's Amended Complaint--Claims

In his amended complaint (Docket 55) Mr. Gard alleges the defendants have been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Specifically, Mr. Gard alleges the defendants failed to properly treat his diabetic condition in various ways and failed to timely provide him with properly fitting prescription eyeglasses.  See Docket 55 at ¶¶ 24-75.  Mr. Gard re-alleges his

---

[4]     In a letter to the district court, Mr. Gard indicated he did not intend to submit an additional brief despite the opportunity to do so after being provided his complete institutional medical file. Docket 132.

Americans with Disabilities Act claims.  Id. at ¶¶ 76-84.  He also alleges the defendants retaliated against him for exercising his constitutional rights.  Id. at ¶¶ 85-114.

### 1.     Deliberate indifference claims.

Mr. Gard generally alleges he is an insulin-dependent diabetic.  Docket 55, ¶ 24.  He takes insulin injections four times per day.  Id. ¶ 26.  He claims the defendants have been deliberately indifferent to his diabetic condition in three ways (id. at ¶¶ 27-47, ¶¶ 56-75)) and that they have denied him properly fitting eyeglasses (¶¶48-55).

#### a.     Diabetic shoe claim.

Mr. Gard alleges he was given a medical order for diabetic shoes on March 8, 2010, per diabetic protocol.  Id., ¶ 27.  In 2012, Mr. Gard received a response to a grievance which he filed about his diabetic socks which stated he would receive diabetic shoes per his medical order.  Id. at ¶ 34-35.  Mr. Gard did not actually receive his diabetic shoes until after he filed his original complaint in this matter.  Id., ¶ 35.

#### b.     Diabetic sock claim.

Mr. Gard was given an order for diabetic socks on March 8, 2010, per diabetic protocol.  Docket 55, ¶ 27.  He was given a sock that would not fit on his foot, and only after demonstrating to unit staff Sherry O'Conner that these socks would not even fit on his foot was he given a sock that was sold in the

commissary which had a restrictive band around the top that still caused swelling in his leg.  Id., ¶ 28.

Mr. Gard contacted the physician's assistant "PA" (Joe Hanvey) and was told "medical" would contact laundry to remedy the situation.  Id. at ¶ 29.  On Mr. Gard's next visit to the PA, Mr. Gard told Mr. Hanvey about the problems he was having with the socks but PA Hanvey said laundry provided him with diabetic socks and there was nothing else Mr. Hanvey could do about it.  Id. at ¶ 30.  Mr. Gard made several attempts to correct the situation with Muriel Namminga to no avail.  Id. at ¶ 31.  Mr. Gard started to go without socks to prevent his feet from swelling.  Id. at ¶ 32.  He was "written up" several times for not wearing socks and was not allowed to go to recreation or day hall without socks.  Id. at ¶ 33.  Mr. Gard filed a grievance on this issue in 2012.  The response to his grievance instructed him to go to medical, even though a copy of his medical order for diabetic socks was included with his grievance.  Id. at ¶ 34.

Mr. Gard returned to Mike Durfee State Prison (MDSP) in January 2013.  He was again given commissary socks and complained to Unit Manager Deglman.  Unit Manager Deglman spoke to Susan Jacobs.  Susan Jacobs said Mr. Gard could wear what everyone else wears or buy his own socks.  Id. at ¶ 36.  In mid-December, 2013, having no choice but to wear the socks he had been given with a restrictive band around the top, Mr. Gard's leg became

swollen to twice its normal size and he was in pain to the point of not being able to walk, and had an orange band around his leg.  Id. at ¶ 37.

Mr. Gard was sent to medical on an "emergency" basis and was prescribed medication.  He was given another medical order for diabetic socks. Id. at ¶ 38.  When Mr. Gard tried to explain to Kelly Swanson that he already had a medical order for diabetic socks, she said "I just write the order, it is not my problem where you get the socks."  Id. at ¶ 39.

Mr. Gard took the medical order to Muriel Namminga in the laundry. Ms. Namminga refused to look at the order and asked Mr. Gard to leave.  Id. at ¶ 40.  Mr. Gard took the order to Unit Coordinator Tammy DeJong. Ms. DeJong called Ms. Namminga who said Susan Jacobs told her Mr. Gard should buy his own diabetic socks.  Id. at ¶ 41.  Ms. DeJong was aware Mr. Gard had no serviceable socks and had been shown the socks he had been given would not fit on Mr. Gard's size 15 EEEE foot.  Id. at ¶ 42.  Ms. DeJong, Ms. Namminga, and Ms. Jacobs disregarded a valid medical order.  Id. at ¶ 43. In May 2014, Mr. Gard received another medical order for diabetic socks but was given socks from Wal-Mart that did not fit.  Id. at ¶ 44.  Mr. Gard returned to medical and showed the socks to nurse Amy Sieh.  Nurse Sieh spoke with Ms. Namminga.  Nurse Sieh told Mr. Gard that Ms. Namminga had called Wal-Mart and was told "those socks are better than any diabetic socks made." Id. at ¶ 46.

After he was given diabetic socks, the swelling problem in Mr. Gard's legs has subsided.  He still has pain and red rings around his legs that the PA told him is caused by iron deposits and will not go away.  Id. at ¶ 47.

### c.    Diabetic diet claim.

In mid-2010 Mr. Gard saw Jenifer Bemboom, dietician, via skype who at that time recommended for him a 2800 calorie diet.  Docket 55 at ¶ 56. PA Hanvey then prescribed a 2800 calorie low carb diet for him, which he has never received.  Id. at ¶ 57.  The content of Mr. Gard's trays and portion size became so bad at one point that Captain DeJong and Lt. Dufer photographed the trays, and other inmates, and sent the photos to the administration.  Id. at ¶ 58.  Captain DeJong told Mr. Gard it had "not worked out well" last time he attempted to intervene with his diet trays and that he was told not to do it again.  Id. at ¶ 59.

Mr. Gard met with Susan Jacobs in May, 2011.  Id. at ¶ 66.  She said she had done all she could do about Mr. Gard's diet and if he continued to file grievances, he "might like the food better in Sioux Falls."  Id.   Mr. Gard was transferred to the South Dakota State Penitentiary (SDSP) Sioux Falls in January, 2012.  Id. at ¶ 61.  He asked for the 2800 tray but was told "we don't do that diet here," by Carla.  Id. at ¶ 61.

Even though Mr. Gard had a valid medical order for a 2800 calorie diet, he was told by the Food Service Manager (John Trewiellar) at the SDSP that they did not have the 2800 calorie diet tray at the SDSP.  Id. at ¶ 62.  The PA

9

(Ryan Manson) continued his medical order for a diabetic diet but did not intervene . Id. at ¶ 63.  Mr. Gard filed a grievance with Unit Manager Fantroy but Mr. Fantroy did not respond.  Id. at ¶ 64.  Mr. Gard transferred back to MDSP in January, 2013.  Id. at ¶ 65.  He asked for the 2800 diet tray but was given a "bland" tray by Val.  Id.  When Mr. Gard told Val the bland tray was not correct she told him to take the mainline tray.  Id.

Barry Schroeter, the Food Service Manager, directed that Mr. Gard should receive the bland tray and receive his additional calories from his sack lunches as directed by Jenifer Bemboom.  Id. at ¶ 66.  The sack lunches were prescribed by PA Hanvey to supplement Mr. Gard's "poor diet."  Id. at ¶ 67.  In September 2013 PA Hanvey told Mr. Gard he was doing permanent damage to his body because he was not controlling his blood sugars.  Id. at ¶ 68. Mr. Gard explained he was "only eating the food provided" but PA Hanvey said he could not do anything about Mr. Gard's diet.  Id.

Mr. Gard has cut down on his carb intake, and his sugars are now lower, but he is "hungry all the time."  Id. at ¶ 69.  In January 2014 Mr. Gard gave his diet order to an inmate who prepares the special diet trays.  Id. at ¶ 70.  The inmate said he "has no idea what a 2800 calorie tray consists of, and that he has no menu for diabetics.  He gives the diabetics whatever he has, and that is basically a bland tray."  Id.  Mr. Gard still has a medical order for a diabetic tray "which he is obviously not getting."  Id. at ¶ 71.

10

PA Hanvey and "most of the nurses" that oversee insulin use have told Mr. Gard and other inmates that the diet is the reason their diabetes is uncontrolled.  Id. at ¶ 72.  The doctor that performed Mr. Gard's heart procedure in February, 2013, gave him a list of foods to avoid (white rice, pasta, anything processed).  Id. at ¶ 73.  Because these items are the "only things" on most trays, Mr. Gard does not eat anything.  Id.  Mr. Gard believes that CBM Food Services and its dietician (Jenifer Bemboom) should be required to provide him with his prescribed diet.  Id. at ¶ 74.  His project applications to add healthy choices to the commissary have been denied.  Id. at ¶ 75.   He is not getting the diet he has been prescribed; therefore his diabetes is very hard to control.  Id. at ¶ 82.  His continued elevated blood glucose levels are doing permanent harm to his body.  Id.

### d.    Eyeglasses claim.

Mr. Gard traveled to Sioux Falls in February, 2013, for a medical procedure and had to pack his glasses for the trip.  His glasses were lost or stolen and were never returned to him.  Docket 55, ¶ 48.  Mr. Gard grieved the issue, but the response indicated there were no glasses in the box when it was inventoried, even though "glasses" were clearly marked on his pack-up sheet.  Id. at ¶ 49.  Mr. Gard borrowed another inmate's glasses for several months before he saw the eye doctor.  He was given new glasses that did not fit his head.  Id. at ¶ 50.

11

Mr. Gard grieved the issue again, and was told to kite medical to get better fitting glasses. <u>Id.</u> at ¶ 51. When Mr. Gard sent a kite to medical, he was instructed to come to sick call. When he went to sick call, he was told he had not followed procedure. The medical staff did not make an appointment with the eye doctor. <u>Id.</u> at ¶ 52-53. Mr. Gard got another pair of glasses in July but those glasses also do not fit him properly or comfortably. <u>Id.</u> at ¶ 54. Mr. Gard has requested but not been allowed to purchase his own glasses. <u>Id.</u> at ¶ 55.

### 2.    Retaliation Claims.

Brian Holzer was taken to the special housing unit (SHU) on May 17, 2014. Docket 55, ¶ 85. Major Leland Tjeerdsma interviewed Mr. Holzer in the SHU and asked him about Mr. Gard. <u>Id.</u> Major Tjeerdsma offered to make a deal with Mr. Holzer if Mr. Holzer implicated Mr. Gard. <u>Id.</u> Mr. Holzer refused. <u>Id.</u>

On June 6, 2014, Tammy DeJong removed 2 pieces of fruit from Mr. Gard's room. The fruit came from Mr. Gard's medical sack lunches. <u>Id.</u> at ¶ 86. Mr. Gard asked why Ms. DeJong was taking his fruit and Ms. DeJong replied "because I can, so sue me." <u>Id.</u> Mr. Gard received a write up for "conduct which disrupts" and placed on room restriction, even though medical told him he could eat his food as necessary. <u>Id.</u> at ¶ 87.

Other inmates have told Mr. Gard that Tammy DeJong has taken items from Mr. Gard's room during 10:30 p.m. rounds, but that she does not go into

anyone else's room.  Id. at ¶ 88.  Additionally, Mr. Gard filed several informal resolution requests in 2014 that were denied.  Id. at ¶ 89.  His subsequent administrative remedy requests were rejected even though there is no policy that allows ARs to be rejected.  Id.  Mr. Gard believes his administrative remedies are being handled in this manner in retaliation for attempting to file grievances.  Id.

In late May unit staff told Mr. Gard he was the "most frequent filer" of grievances and mocked him by asking if he needed to see the shrink or if he was planning to commit suicide, because he gave away some of his expired food.  Id. at ¶ 90.  Tammy DeJong told him filing so many grievances would not help and would not change anything.  Id. at ¶ 91.

When Mr. Gard received expired food items in a care package from family members, he alerted his case manager Tjeerdsma.  Id. at ¶ 93.  Mr. Tjeerdsma replaced two out of the three expired items.  Id.  Mr. Gard gave the expired item to his roommates, then filed a grievance.  Id.  He explained to Tammy DeJong that he gave the expired item away and she told him he violated policy by doing so.  Id. at ¶ 94.  Mr. Gard later received a write up for giving his food away, but the write up was later dismissed.  Id. at ¶ 95.  Mr. Gard believed if he continued to file grievances his situation would get worse, so he stopped writing grievances.  Id. at ¶ 96-97.

Mr. Gard was placed in the SHU on September 1, 2014, for "conduct which disrupts."  Id. at ¶ 98.  Mr. Gard was not allowed to pack his property

and received only one book and no legal work.  Id. at ¶ 99.  He was on the list to see the staff attorney, but was not taken to his appointment even though he had a criminal appeal and civil matter pending.  Id. at ¶ 100.  He was released from the SHU on September 5, 2014, but given an additional five days of room restriction.  The other inmate involved in the incident did not receive any punishment.  Id. at ¶ 101.

Mr. Gard was released from the SHU at approximately 10:00 a.m.  At 11:00 a.m. he asked Mr. Tjeerdsma why he had not received his property back. Id. at ¶ 102.  Property Officer Stevens informed Gard he would have to consolidate his property into three boxes.  Id.  Mr. Gard explained his property minus legal work would fit into three boxes but Tjeerdsma insisted Mr. Gard could only have three boxes total.  Id.

Mr. Gard told Mr. Tjeerdsma he would "take care of the problem in another manner."  Id. at ¶ 103.  Mr. Gard next asked Tammy DeJong about his property.  Id. at ¶ 104.  Tammy DeJong contacted Sue Jacobs.  Id.

Later, Tammy DeJong said Mr. Stevens left for the day (Friday).  Id. at ¶ 105.  Mr. Gard had no hygiene items or clothes so he was allowed to retrieve those items but not his legal work.  Id. at ¶¶ 106-07.  He did not receive the remainder of his property until Tuesday, September 9, 2014.  Id. at ¶ 108. When he did receive his property back his legal files were "destroyed."  Id. at ¶ 109.  He found out his property was kept in a SHU cell instead of property so

he believes his legal materials were "messed up" while stored in the SHU cell. Id. at ¶ 109.

Sergeant Larson harasses and intimidates Mr. Gard.  Id. at ¶ 111.  On October 2, 2014, Mr. Gard was called to the medical building to get his insulin. Id. at ¶ 110.  Sergeant Larson ordered Mr. Gard back to his room even though he knew Mr. Gard had been called to medical.  Id.  Mr. Gard waited until Sergeant Larson left and then obtained permission to go to medical from someone else.  Id.  Sergeant Larson unsuccessfully searched his room on October 28, 2014, and said "you just wait."  Mr. Gard has been told by other officers that they have instructions to write him up for "anything that looks like a violation."  Id.

On November 3, 2014, Tammy DeJong took away Mr. Gard's tinted safety glasses.  Id. at ¶ 112.  Mr. Gard has had a medical order for the tinted glasses since 2010.  Id.  Ms. DeJong called Kelly Swanson in medical and was told Mr. Gard did not need tinted glasses, "once again denying a valid medical order."  Id.

On November 13, 2014, Randy Stevens rejected books Mr. Gard ordered and purchased.  Id. at ¶ 113.  Mr. Gard did not file a grievance about this matter because "based on previous experience" he believed he was unable to do so because of retaliation, threats and harassment.  Id.

In March, 2014, Mr. Gard was told he would only be able to view his medical records once per quarter.  Id. at 114.  He filed a grievance but Tammy

DeJong told him he could see his records once per week.  Id.  Despite this, three of his requests to view records went unanswered.  Id.  Mr. Gard does not believe it does any good to file a grievance because his grievances are ignored. Id.

**B.    Requirements for Summary Judgment Submissions.**

Federal Rule of Civil Procedure 56 governs the submission of facts and evidence in support of or opposing a party's position on summary judgment. Rule 56(c) states:

> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or;
>>
>> (B) showing that the materials cited do not establish the Absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) *Objection That a Fact is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) *Materials Not Cited.*** The court need not consider only the cited materials, but it may consider other materials in the record.
>
> **(4) *Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and

show that the affiant or declarant is competent to testify on the matters stated.

See FED. R. CIV. P. 56(c).

The court may grant the motion if the record is otherwise sufficient and the opposing party fails to support its own assertion of fact, or to address the moving party's assertion of fact as required by FED. R. CIV. P. 56(c). FED. R. CIV. P. 56(e)(3). The United States Supreme Court explained Rule 56 succinctly in Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990). "Rule 56(e) provides that judgment shall be entered against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Id.

"[C]onclusive assertions of ultimate fact are entitled to little weight when determining whether a nonmovant has shown a genuine issue of fact sufficient to overcome a summary judgment motion supported by complying affidavits." Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir. 1984) (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure, § 2727 at pp. 157-59 (1983)). In  Miller, the plaintiff opposed the defendants' summary judgment motion with his own affidavit which contained "sweeping conclusory allegations that both defendants intentionally failed to protect him . . ." Miller, 728 F.2d at 1025. The affidavits he submitted were deficient because (among other reasons) they contained inadmissible hearsay. Id. at 1026. The court explained the

17

plaintiff's conclusory allegations were "unsupportable, frivolous, and cannot withstand summary judgment."  <u>Id.</u>  <u>See</u> <u>also</u>, <u>Wells Dairy Inc. v. Travelers Indemnity Co.</u>, 241 F. Supp.2d 945, 956 (N.D. Ia. 2003) ("Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based on personal knowledge may be stricken.") (citing cases).[5]

Likewise, in <u>Malorana v. MacDonald</u>, 596 F.2d 1072, 1080 (1st Cir. 1979) the plaintiff's affidavits were rejected because the defects were "numerous."  <u>Id.</u>  The court noted the plaintiff's affidavits were not based on personal knowledge, but instead were based on statements she heard or documents she read, but the properly authenticated transcripts/documents were not attached to the affidavit.  <u>Id.</u>  Her affidavit contained inadmissible hearsay.  <u>Id.</u>  And, "[p]articular portions of the counteraffidavits were improper

---

[5]     An extreme example of an improper affidavit is found in <u>Alvariza v. Home Depot</u>, 2007 WL 794416 (D. Colo., March 14, 2007).  In that case, the plaintiff claimed she was wrongfully fired because of age discrimination.  When the defendant moved for summary judgment, the plaintiff submitted an affidavit in opposition which stated in part:

> (1) Mr. Leo was neither human nor a resource—but that was his job; (2) the older women were left feeling adrift, while other, younger, more attractive people were doted upon by managers who should be trained better; (3) this pattern of sexist remarks is not limited to an isolated instance in an accessible computer room. Mr. Hardy set the tone each and every time he came into the store plaintiff was working. He was on a mission –put out to pasture older women, and hire . . . prettier women—and he let plaintiff know this on a regular basis.

<u>Id.</u> at *6.  The court held this affidavit "falls far, far short of the requirements of Federal Rule of Civil Procedure 56 . . ."  <u>Id.</u>

because they purported to examine the defendants' thoughts as well as their actions.  Other portions contained impermissible speculation or conclusory language."  Id.

In Perez v. Volvo Corp., 247 F.3d 303 (1st Cir. 2001), the sufficiency of the following paragraph from Mr. Gonzalez's affidavit was the subject on appeal:

> Volvo knew about the higher AUM invoice cost figures.  From my personal discussions with various Volvo representatives, I know that Volvo was fully aware of the relationship between Trebol and AUM, including the nature and amount of the guarantees.

Id. at 315.  The court observed "if admissible, these statements are little short of damning."  Id.  The statements were not admissible, however, because though they purported to be based on Mr. Gonzalez's personal knowledge, they were "totally lacking in specificity . . ."  Id.

> Affidavits purporting to describe meetings or conversations need not spell out every detail, but to receive weight at the summary judgment stage they must meet certain rudiments.  Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56 . . . even when proffered in affidavit form by one who claims to have been a participant.

Id. (citations omitted).  See also James Wm. Moore, et. al. Moore's Federal Practice § 56.14(1)(d) (3d ed. 1997) ("The affidavit, in addition to presenting admissible evidence, must be sufficiently specific to support the affiant's position.").  In Perez, the court determined the above language, along with other language in the affidavit was insufficient.  Perez, 247 F.3d at 316. "Although these statements purport to deal with Volvo's knowledge of ongoing

events, they are conclusory rather than factual . . . such gauzy generalities are not eligible for inclusion in the summary judgment calculus." Id. at 316-17.

A district court may strike speculative and conclusory affidavits from the record. Broughton v. School Board of Escambia County, Florida, 540 Fed. Appx. 907 (11th Cir. 2013). In Broughton the district court struck the non-movant's affidavits submitted in resistance to a summary judgment motion which "contained mostly legal conclusions and factual allegations [that] were not based on personal knowledge." Id. at p. 911. The Eleventh Circuit affirmed, noting "the affidavits . . . simply say [the defendant] lied and mistreated [the plaintiff] without any supporting facts indicating how they arrived at those conclusions. They therefore do not satisfy the standard Rule 56(c) requires." Id.

In Perez, 247 F.3d at 315, the court explained, however, that the "rule requires a scalpel, not a butcher knife. The  . . . court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole." Id.  On a motion for summary judgment, therefore, the district court should disregard only those portions of an affidavit that are inadequate pursuant to FED. R. CIV. P. 56(c), and consider the rest.  Id.

Here the parties submitted affidavits supporting their positions that the defendants' motion for summary judgment should be either granted or denied. The court has carefully reviewed all the affidavits to determine whether they comply with Fed. R. Civ. P. 56(c).   Some of the affidavits, or parts of them, fall

short.  Those affidavits, or parts of them, have been excised from the recitation of facts below.

## C.    Facts Properly Supported by Affidavits and Other Evidence.

### 1. Deliberate indifference claims.

#### a.  Diabetic shoe claim.

Mr. Gard wrote a kite to Warden Dooley in October, 2009, requesting that he be issued a pair of New Balance shoes because the Velcro type issued by the laundry did not fit him.  Docket 88-8.  Mr. Gard explained he had received New Balance shoes "since being in the system."  Id.  Warden Dooley's response  indicated Mr. Gard could receive New Balance shoes if the standard issue Velcro shoes were not a proper fit.  Id.   Mr. Gard received New Balance shoes on October 29, 2009, after verifying "this is the size New Balance shoe that I need."  Docket 88-9; Docket 88-3, ¶ 7; Docket 88-4, ¶ 5.

Mr. Gard received a medical order on March 8, 2010, to be measured and fit for New Balance shoes per diabetic protocol.  Docket 88-14; Affidavit of Misty Tolsma, Docket 88-7, ¶ 5.  These shoes, as indicated by Mr. Gard in a kite request slip dated October 23, 2009, were the same shoes he had been provided with "since being in the system."  Docket 88-8; Bob Dooley Affidavit, Docket 88-3, ¶ 4; Muriel Namminga Affidavit, Docket 88-4, ¶ 4.[6]

---

[6]    It is not entirely clear, but appears no shoes were *issued* to Mr. Gard in March 2010.  There is writing on Exhibit 17 which indicates "issued NB on 10-29-09 per medical (Michelle) cannot get another pair until (illegible).  The

In July, 2010, Mr. Gard indicated his shoes were wearing out.  Docket 88-3, ¶ 8.  Warden Dooley responded by authorizing another pair of New Balance shoes.  Id., ¶ 9.  Mr. Gard received these shoes on August 5, 2010.  Docket 88-10; Docket 88-4, ¶ 5.

Mr. Gard transferred from Mike Durfee State Prison (MDSP) to the South Dakota State Penitentiary (SDSP) in January, 2012.  Docket 1, p. 6.  Mr. Gard filed an informal resolution request on July 14, 2012, explaining he had a medical order for diabetic shoes and "had been trying to get shoes and socks since he got to this unit in January."  Docket 88-11.[7]  Warden Weber

---

defendants provided the affidavit if Misty Tolsma.  Docket 88-7.  Ms. Tolsma is a nurse at MDSP and is the clinical supervisor at that facility.  Id. at ¶¶ 1-2.  Ms. Tolsma explains that "pursuant to standard policy/practice, a medical order issued by Health services, unless specifically indicating otherwise, remains valid for only one year after the date it is issued.  After such period, it has to be renewed by medical staff."  Docket 88-7, ¶ 63.  See also, Appendix A (nurses' notes nated 3/11/10, produced pursuant to this court's order dated December 23, 2015).

[7]     Here is an example of affidavits from both sides which have been partially excised from consideration.  Mr. Gard did not admit nor deny the defendants' statement of undisputed fact regarding Warden Weber's response to his request for administrative remedy about the diabetic shoes.  Instead, Mr. Gard referred to his own affidavit (Docket 130) at ¶ 13.  The paragraph reads (in its entirety) as follows:

> Gard made numerous complaints about his shoes to unit staff.  They were so worn out that Gard could not participate in recreational activities, since the walking area at the recreation yard is a dirt track, with many small rocks, Gard could not walk around the track, or go outside during wet weather.  After Gard filed his grievances, it took almost two years for Gard to get his shoes.  After this pair were worn out and Gard requested new shoes,

22

Namminga states that 'Gard's shoes had plenty of wear left but offered a pair of Velcro replacements,' knowing that Gard had already used the proffered Velcro shoes which caused blisters on his feet, at any rate why would it be necessary to provide loaner shoes if Gard's had plenty of wear left? It makes no sense.  At any rate, Gard did not get new shoes for two years after he filed his grievance, and had to wear the same shoes for almost four years.  When the medical providers have stated to Gard that footwear is very important to diabetics, should it be necessary for Gard to have an amputation before he gets the footwear he needs?"

This paragraph suffers the same infirmities as did the Gonzalez affidavit in the Perez case.  "Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56 . . . even when proffered in affidavit form by one who claims to have been a participant." Perez 247 F.3d at 315.

Additionally, though Gard avers Ms. Naming knew the Velcro shoes caused blisters on his feet, he offers no evidence or explanation for how Ms. Naming knew this.  An affidavit in which the affiant purports to know another's thoughts but provides no foundation for the basis of such knowledge is also improper under Rule 56.   Maiorana v. MacDonald, 596 F.2d 1072, 1080 (1st Cir. 1979).

The defendants likewise offer Ms. Namminga's affidavit for the proposition that Mr. Gard received another pair of New Balance shoes in 2015 before the pair he had were worn out, and after he refused an interim offer of regular shoes.  The relevant portion of her affidavit (Docket 88-4, ¶¶ 7-8) states "Gard recently approached staff at the MDSP on or about March 2, 2015, and complained that his shoes were again wearing out.  At that time, he was advised that the shoes in question had been ordered but that it could take two-three weeks for them to arrive.  It appeared to staff, when looking at the shoes worn by Inmate Gard, that they still had plenty of wear left.  Gard, therefore, was told that he would be provided with his new shoes as soon as they arrived at the MDSP and, in the interim, he could either continue to wear his current shoes or that staff were willing to provide him with a pair of Velcro shoes to wear until his New Balance shoes arrived.  He refused any offer to provide him with temporary Velcro shoes."

Ms. Namminga's affidavit does not assert that she was the "staff" with whom Mr. Gard had this conversation or made this observation about the

23

responded at the Administrative Remedy level on July 25, 2012 indicating "unit staff has ordered your diabetic shoes, but your request for socks will need to go through health services."  Docket 88-12.[8]

Mr. Gard returned to MDSP in January, 2013.  Docket 88-3, ¶ 11.  He received New Balance shoes on February 13, 2014.  Id.; Docket 88-13; Docket 88-57; Docket 88-4, ¶ 6.  Mr. Gard received another pair of New Balance shoes on March 12, 2015.  Docket 88-4 at ¶ 9.

**b. Diabetic sock claim.**

Mr. Gard reported to Health Services on March 8, 2010.  Docket 88-38; Docket 88-7, ¶ 4.  He was diagnosed with non-insulin dependent diabetes mellitus.  Id.  He received a medical order for diabetic shoes and socks.  Docket 88-37.  The order stated, "measure and fit for New Balance shoes per diabetic protocol and issue six pr. diabetic socks in exchange for old socks."  Docket 88-14; Docket 88-7 at ¶ 5.

On April 8, 2010, Mr. Gard reported to health services that he wore a size 15 shoe and the socks he had been provided barely covered his heel.  He told PA Hanvey that he had been unable to get diabetic socks and the "lady in the laundry told him the only comment on size and he would have to wear

---

shoes, nor does it cite any documentary evidence, subject to any of the applicable hearsay exceptions, to support these assertions.

[8]    Again, it is unclear whether Gard ever received these New Balance shoes. There is no "receipt" for them in the record as there is for the shoes he received on October 29, 2009, August 5, 2010, and February 13, 2014.

whenever they have." Docket 88-39; Docket 88-7 at ¶ 58.  PA Hanvey assured

Mr. Gard "we would be talking with department of corrections staff and attempt

to obtain socks and actually fit in the meantime he would need to wear his

regular socks."[9]  Docket 88-39.

Though Mr. Gard visited health services at least ten times between June,

2010, and October, 2011, he did not mention his socks again to his health care

providers at MDSP during these visits.  Docket 88-7, ¶ 60; Docket 88-47

through 88-55 and Docket 88-62.

Mr. Gard transferred to the South Dakota State Penitentiary in early

2012.  Docket 88-3, ¶ 10.  Docket 1, ¶ 6.  Mr. Gard visited health services in

Sioux Falls on February 3, 2012.  Docket 88-56; Docket 88-7, ¶ 62.  During

that visit, Mr. Gard informed the medical staff of his 2009 medical order for

diabetic shoes and socks.  Id.  Health services staff indicated to Mr. Gard that

such orders were "only good for one year."  Id.  The note reveals Mr. Gard "does

not accept this explanation."  Id.  The visit was terminated when Mr. Gard

---

[9]     It appears this medical note is the victim of an amateur transcriptionist.
It probably should say "lady in the laundry told him ***they only come in one***
size and he would have to wear ***whatever*** they have." And, "we would be
talking with department of corrections staff and attempt to obtain socks ***that***
actually fit in the meantime he would need to wear his regular socks."

became argumentative about his treatment and questioned the provider's qualifications.  Id. [10]

Mr. Gard filed a grievance (informal resolution request or IRR) regarding his diabetic shoes and socks in July, 2012, while housed at the SDSP.  Docket 88-11; Docket 88-7, ¶ 64.  His IRR indicated "I have a med order for diabetic shoes, size 15-4E and diabetic socks.  I have been trying to get shoes and socks since I got to this unit in January of this year.  I talked to UM Fantroy and now UM Madsen on numerous occasions to no avail."  Docket 88-11.  The response to Mr. Gard's IRR indicated "UM Madsen is looking into your condition for shoes. We do not provide diabetic socks."  Id.

On July 18, 2012, Mr. Gard filed a request for administrative remedy. Docket 88-15.  He again stressed that because he was an insulin-dependent diabetic, he needed good footwear.  Id. He attached a copy of his medical order for diabetic shoes and socks.  Id.  On July 25, 2012, Warden Weber responded to the administrative remedy request.  Docket 88-12.  Warden Weber partially granted Mr. Gard's request, and indicated "unit staff ordered your diabetic shoes, but your request for socks will have to go through health services."  Id.; Docket 88-3, ¶ 10; Docket 88-7, ¶ 67.  On October 10, 2012, Mr. Gard visited health services at the SDSP.  Docket 88-40; Docket 88-7, ¶ 68.  During that

---

[10]     Mr. Gard objected to this statement of fact and Misty Tolsma's affidavit explaining it is based upon Mr. Gard's medical records (specifically, Docket 88-56).  For the reasons explained in this court's order dated December 23, 2015, (Docket 128) Mr. Gard's medical records are admissible.

visit, Mr. Gard did not inquire or complain about his socks.  Mr. Gard specifically denied any problems with swelling of his feet or ankles.  Id.

Mr. Gard returned to MDSP in January, 2013.  Docket 55, ¶¶ 36, 65.  He again received ordinary socks.  Docket 88-4, ¶ 14.  The MDSP laundry supervisor avers she did not believe Mr. Gard had a current medical order for diabetic socks.  Id.  The March 8, 2010, order "had long since expired."  Docket 88-7, ¶ 69.  Mr. Gard did not complain about his commissary socks during his March 8, 2013, health services visit nor did he request a new medical order for diabetic socks.  Docket 88-41.  Mr. Gard again did not mention the socks or request a new medical order for them during his MDSP health services visit on April 22, 2013.  Docket 88-42.

Mr. Gard complained to Ms. Namminga in April, 2013, that the regular socks were too small.  Docket 88-4, ¶ 15.  On April 30, 2013, Ms. Namminga purchased "extra-large" socks for Mr. Gard from Wal-Mart.  Docket 88-57; Docket 88-4 at ¶ 15.[11]   Ms. Namminga believed the socks purchased at Wal-Mart were appropriate diabetic socks.  Docket 88-4, ¶ 13.  No one from Health

---

[11]   In their statement of undisputed facts, the defendants refer to Ms. Namminga's April, 2013, purchase as being "shortly" after PA Hanvey's April, 2010, documented conversation with Mr. Gard regarding the need for socks which fit. Docket 87, ¶ 31-33.  Three years is not "shortly."  Similarly, Ms. Namminga's affidavit refers to the April, 2013, purchase of extra-large socks from Wal-Mart as "again." Docket 88-4, ¶ 15.  It appears, however, that April, 2013, was the first time Ms. Naming purchased extra-large socks for Mr. Gard from Wal-Mart.  Docket 88-57.

Services told her otherwise.  Id.   In August, 2013, Mr. Gard received more socks.   Docket 88-57.  Mr. Gard did not tell Ms. Namminga that the extra-large Wal-Mart socks were otherwise not acceptable or that they were not "diabetic" socks.  Docket 88-4, ¶ 16.  Ms. Namminga therefore believed she was complying with the medical order for diabetic socks by buying extra-large socks from Wal-Mart.  Id.

When Mr. Gard reported to MDSP health services on August 21, 2013, the only concern he voiced was his diabetic snacks. He did not mention his socks.  Docket 88-43, Docket 88-7, ¶ 71.  Mr. Gard reported to MDSP health services on December 17, 2013, reporting swelling in his bilateral lower extremities.  Docket 88-44; Docket 88-7, ¶ 72.  Mr. Gard did not, however, attribute his lower extremity swelling to his socks nor did he complain that his socks were inadequate.  Id.  Instead, he opined he may have a "blood clot" and asked to be given daily baby aspirin for his heart health.  Id.  Mr. Gard informed PA Hanvey he had not taken several of his medications (Singular, Metformin, Pepcid, Synthroid, Lipitor, and Glucotrol)[12] for several months. Docket 88-44.  PA Hanvey therefore discontinued those medications.  Id.

---

[12]     Singulair is indicated for the chronic treatment of asthma.  Metformin is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.  Pepcid is indicated for the short term treatment of gastroesophageal reflux disease (GERD).  Synthroid  is used as a replacement or supplemental therapy in congenital or acquired hypothyroidism of any etiology.  Lipitor is one component of multiple risk factor intervention in individuals at significant risk for atherosclerotic vascular disease due to

PA Hanvey prescribed aspirin and Lasix.[13]  He also prescribed  "TED hose knee high" to be worn "on in a.m., off in p.m."  Docket 88-44; Docket 88-7, ¶ 73.[14]  Mr. Gard returned to MDSP health services on December 30, 2013. Docket 88-44; Docket 88-7, ¶ 74.  His lower extremity swelling was improved. Id.  On December 30, 2014, Mr. Gard's lower extremity swelling was again improved. Docket 88-45.  He was again documented as being un-cooperative with his recommended medical care, however because he had refused the recommended metabolic panel testing which was supposed to have occurred on December 25th and had failed to take his blood pressure medication the morning of his visit to health services.  Id.  During this visit Mr. Gard was instructed to return "p.r.n." if he experienced new or worsening symptoms.[15]

---

hypercholesterolemia.  Glucotrol is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. www.rxlist.com  (Last checked January 26, 2016).

[13]     Lasix is a diuretic indicated for the treatment of edema (swelling). www.rxlist.com  (last checked January 25, 2016).

[14]     TED hose are long, tight fitting stockings that place mild static pressure on the legs to prevent blood from clotting. Following major joint replacement or thoracolumbar spine surgery, the risk of developing blood clots in the legs increases. Compression garments are also used to treat swelling in the legs and ankles, varicose veins, and spider veins. TED hose may help to prevent the progression of serious vein problems and diseases. http://www.spine-health.com/glossary/ted-hose.  (Last checked January 25, 2016).

[15]     The acronym "p.r.n." stands for the Latin phrase pro re nata and means "according to circumstances" or "as needed."  http://medical-dictionary.thefreedictionary.com/p.r.n (last checked January 26, 2016).

Mr. Gard received another medical order for diabetic socks on January 2, 2014.  Docket 8-4; Gard affidavit, Docket 130, ¶ 10.  It instructed that he could "exchange his current socks for diabetic socks at laundry up to 6 pair.  May exchange yearly."  Id.  When he presented his order for diabetic socks to the laundry supervisor on January 29, 2014, however, Mr. Gard was instructed he must purchase his own six pairs of "extra-large" socks.  Docket 8-3.  Gard affidavit, Docket 130, ¶ 12.

Mr. Gard's swollen legs were "stable" when he reported to MDSP health services on January 28, 2014.  Docket 88-10; Docket 88-7 at ¶ 75.  Again, Mr. Gard was instructed to follow up p.r.n. if the swelling in his legs increased.

Mr. Gard attributes his swollen legs to his socks, and avers his legs stopped swelling when he stopped wearing the socks.  Gard affidavit, Docket 130 at ¶ 10.[16]  Mr. Gard's medical providers, however, never indicated the swelling in his legs was caused by his socks and there is likewise no such indication in his medical records.  Docket 88-7, ¶ 76.  Misty Tolsma, who is a nurse and the clinical supervisor at MDSP health services explains there are several causes for lower extremity swelling including:  congestive heart failure, infection, trauma, venous insufficiency, and hypertension.  Id.  She does not

---

[16]    The court notes the only indication Mr. Gard notified his medical providers he attributed his swollen legs to his ill-fitting socks appears in the June 13, 2014, medical note—*after* he received the "Dr. Comfort" socks. Docket 88-71.

opine that any of these conditions caused the swelling in Mr. Gard's lower extremities but notes Mr. Gard has been diagnosed with hypertension.  Id.; Docket 88-38.[17]

      Ms. Tolsma stated in her affidavit that Mr. Gard's lower extremity swelling may have been caused by fluid build-up because Mr. Gard refused Lasix, which is a diuretic indicated for the treatment of edema (swelling).  See footnote 10, supra.  Docket 88-7, ¶ 77.  Lasix, however, was not one of the medications Mr. Gard refused according to the medical note cited by Ms. Tolsma.  Id.; Docket 88-46.  See also Gard Affidavit, Docket 130, ¶ 10. Though the medical records document Mr. Gard's refusal of other medications and medical procedures, the defendants have not provided, and the court has not found any medical documentation to support the defendants' claim that Mr. Gard refused to take Lasix.

      Mr. Gard's claim that he now suffers from "red rings" in his legs caused by "iron deposits" or that these markings, whatever their cause, have anything at all to do with his socks, is likewise not supported by anything in his medical records.  Docket 88-7, ¶ 78.  On May 5, 2014, PA Hanvey recommended that Mr. Gard undergo nerve conduction studies to determine the source of

---

[17]    Mr. Gard has also apparently been diagnosed with congestive heart failure.  See Appendix B (Avera medical records dated February 26, 2015, which were produced to the court pursuant to this court's order dated December 23, 2015).

Mr. Gard's lower extremity pain but Mr. Gard refused.  Docket 88-58.

Mr. Gard also refused Neurontin, a drug PA Hanvey prescribed to treat

Mr. Gard's lower extremity pain.[18]  Id.; Docket 88-82.  Gard Affidavit, Docket

130, ¶ 11.

Mr. Gard reported to MDSP health services on May 5, 2014.  Docket

88-58.  During this visit, Mr. Gard reported "he has not received diabetic socks

which were previously ordered."  Id.  PA Hanvey advised Mr. Gard, "we will

have nursing acquire diabetic socks for comfort."  Id.  PA Hanvey also noted

Mr. Gard was not wearing his TED hose as prescribed.  Id.   The handwritten

nurse's note indicates the specific type of sock ordered at this time was "Dr.

Comfort Men's extra roomy socks for diabetic size 15EEEE."  See Appendix C

(produced in response to this court's order dated December 23, 2015).  In her

affidavit, Misty Tolsma opines the socks procured for Mr. Gard pursuant to

PA Hanvey's May, 2014 order "are, from a medical standpoint, comparable to

those socks previously specially purchased for him since April 2010.  The

newer 'diabetic socks' are, for comfort, simply looser around the top."  Docket

---

[18]     Neurontin is indicated for management of postherpetic neuralgia in
adults.  www.rxlist.com (last checked January 26, 2016).

88-7, ¶ 83.[19]  Mr. Gard disputes this claim (Docket 131, ¶ 62) but does not articulate the differences between the extra-large Wal-Mart socks and the Dr. Comfort extra roomy diabetic socks.  Instead, he persists in his request to have this court personally examine his socks.  Id.

### c. Diabetic diet claim.

Mr. Gard was diagnosed with non-insulin diabetes on March 8, 2010. Docket 88-38.  He was seen at MDSP health services on that date and PA Hanvey reviewed diabetic teaching, fingersticks and compliance with medication and diet.  Id.  Mr. Gard, however, refused a heart healthy diet.  Id. Docket 88-7, ¶ 4.  Gard disputes he was ever offered a heart healthy diet.  Gard Affidavit, ¶ 14.  He also disputes he has ever signed a refusal form for a heart healthy diet. This might be technically true, but the court notes Appendix E, which is a form which Mr. Gard refused to sign.  Though the medical note which indicates Mr. Gard refused a healthy heart diet is dated March 8, 2010, the form in his medical file appears to be dated much later.  The form would have acknowledged his refusal of a heart healthy diet.  The date of this form is hard to read but appears to be 2/28/15.  Id.

When Mr. Gard arrived at the MDSP health services department on April 8, 2010, he expressed concern about his diet and requested a diabetic diet with

_____

[19]     This may be a bit of a simplification.  See http://www.healthline.com/health/find-right-diabetic-socks. (last checked February 12, 2016) (copy attached as Appendix D).

low carbohydrates.  Docket 88-39.  Mr. Gard states he has never requested a specific diet. He was prescribed a 2800 calorie diet but does not believe he has ever received the diet he was prescribed and has complained about it from the beginning.  Docket 130, ¶¶ 16-17.  He did not wish to increase his medications but believed he could decrease his blood sugars by changing to a more healthy diet.  Docket 88-39.  PA Hanvey also encouraged Mr. Gard to lose weight.  Id. Mr. Gard then weighed 283 pounds but PA Hanvey encouraged him to drop to approximately 220.  Id.  PA Hanvey referred Mr. Gard to nutritional counseling. Id.; Docket 88-59.  Barry S[chroeter] (food services director) was notified of the referral via email.  Docket 88-59.

Mr. Gard met with Jenifer Bemboom, registered dietician and licensed nutritionist, on May 6, 2010, for an adult nutrition assessment.  Docket 88-1, ¶¶ 3, 7.  Mr. Gard explained to Ms. Bemboom that he skipped breakfast, would like more fruits, vegetables and beef in his meals, that he did not like turkey, rice, or noodles and he did not eat dessert.  Docket 88-60, Docket 88-1,¶ 8. Mr. Gard explains he did not tell Ms. Bemboom what he wanted, but rather what he was accustomed to eating on the "outside" and what was recommended on the handouts he had received. Gard affidavit, Docket 130, at ¶ 15.  Mr. Gard also indicates he has a sensitive stomach and a lot of food upsets his stomach, which requires his use of antacids.  Id. ¶ 16. Ms. Bemboom explained the benefits of a consistent carb diet, but told

Mr. Gard food services may not be able to accommodate his food preferences.
Docket 88-1, ¶ 9, Docket 88-60.  Ms. Bemboom explained the importance of
eating regularly throughout the day, including breakfast.  Id.

Mr. Gard, however, appeared hesitant to eat breakfast.  Docket 88-1,
¶ 10; Docket 88-60.  He informed Ms. Bemboom he would monitor his diabetes
by "self-selection" on the regular diet.  Id.  Ms. Bemboom perceived, through
this meeting with Mr. Gard, that it was important to Mr. Gard that he maintain
control over his food choices.  Docket 88-1, ¶ 10.  Even though Mr. Gard
insisted on staying on the regular diet, Ms. Bemboom recommended to MDSP
health services that Mr. Gard be placed on a 2800-2900 calorie consistent carb
diet.  Docket 88-1,¶ 11; Docket 88-60.  She also recommended MDSP health
services should provide Mr. Gard with educational materials regarding foods on
the regular diet.  Id.  Ms. Bemboom told Mr. Gard she would provide a proper
diabetic diet for him if he was willing to follow it.  Docket 88-1, ¶ 12.

Ms. Bemboom prepared what she believed, based on her training and
experience, to be a proper diabetic diet for Mr. Gard.  Docket 88-1, ¶ 13.  In
preparing the diet for Mr. Gard, she relied upon and used the dietary
recommendations from the American Diabetic Association (ADA) and the
Academy of Nutrition and Dietetics.  Id.

In preparing the diabetic diet for Mr. Gard, Ms. Bemboom used software
analysis for a diabetic menu. Docket 88-1, ¶ 14.  Ms. Bemboom's menu plan
allowed Mr. Gard to adjust the food on his diet to the desired grams of

carbohydrates for each meal.  Id.  She attempted to design a menu so the grams of carbohydrates Mr. Gard consumed were consistent throughout the day (breakfast, lunch and supper).  Id.  Mr. Gard denies the diet prepared for him was a 2800 calorie consistent carb diet.  Docket 130, ¶17.  Nursing notes from May, 2010 reflect that the kitchen called health services to report "the 2800 calorie ADA consistent carb diet that inmate inquired about has not been picked up for any meal since ordered."  Appendix A.

Mr. Gard reported to MDSP health services on June 3, 2010.  Docket 88-47.  He reported doing well overall, but he remained unhappy with his meals.  Id.  He reported his visit with the nutritionist and the recommended ADA diet "however the patient feels this is not adequate."  Id.  On June 7, 2010, Mr. Gard told the nursing staff at MDSP that he "wanted them to inform the dietician that he preferred the regular diet as he does not believe he receives the 2800 ADA CC diet on his tray."  Docket 88-62.  Mr. Gard's medical records throughout the remainder of 2010 and into the beginning of 2011 do not reflect complaints about his diet.  Docket 88-7, ¶ 11, Docket 88-48 through 88-51.

During his visit to MDSP health services on March 31, 2011, however, Mr. Gard again complained about his diet.  Docket 88-52.  He indicated the food in the dining hall was "not healthy."  Id.  Health services staff pulled Mr. Gard's commissary report and noted he had purchased Ramen noodles, jelly beans, Jolly Ranchers, potato chips and Nutty Bars on a regular basis.  Id.

36

When asked about these purchases, Mr. Gard claimed he bought these items but did not eat them.  Id.  PA Hanvey noted Mr. Gard's lack of compliance with medication, lack of exercise, and poor diet as the causes of his elevated blood sugars.  Docket 88-52.  PA Hanvey described Mr. Gard as confrontational and manipulative, and as having "significant issues" with following directions.  Id.

Mr. Gard returned to MDSP health services on April 28, 2011.  Docket 88-53.  Kitchen staff reported Mr. Gard did not regularly pick up his diabetic trays.  Id.  During this visit, PA Hanvey agreed to prescribe diabetic snacks twice daily "to decrease is purchase of junk food from the commissary."  Id.  PA Hanvey instructed that if Mr. Gard gained weight or if his diabetes remained out of control, the diabetic snacks would be discontinued.  Id.  In May, 2011, Mr. Gard was written up for not picking up his diet tray.  Docket 88-17.  He claimed the kitchen could not "get it right" so he saw no need to pick it up.  Id.

A month later in June, 2011, Mr. Gard returned to MDSP health services.  Docket 88-54.  He continued to blame his poorly controlled diabetes on his food.  Id.  He remained noncompliant with fingerstick blood sugars and sliding scale insulin.  Id.  PA Hanvey stated Mr. Gard "continues to deny any self-responsibility in controlling his diabetes."  Id.  Mr. Gard requested a bedtime ("HS")[20] diabetic snack in addition to the two diabetic snacks which

---

[20]   HS is the medical abbreviation for bedtime, or the Latin phrase "hora somni--hour of sleep."

were prescribed at the previous checkup.  Id.  PA Hanvey had a "long

discussion" with Mr. Gard about insulin compliance.  Id.  He added the

bedtime diabetic snack per Mr. Gard's request but PA Hanvey commented that

he "doubted" it would help.  Id.

On June 17, 2011 Dr. Wallinga entered a medical order for diabetic

snacks in the morning, afternoon and at bedtime, for four months.  Docket

88-54; Docket 88-63.  In September, 2011, the order for diabetic snacks was

renewed for one year.  Docket 88-63.

In January, 2012, Mr. Gard transferred to the South Dakota State

Penitentiary (SDSP) in Sioux Falls.  He was scheduled for another consultation

with the dietician.  Docket 88-79.  The nurses at the SDSP saw Mr. Gard on

February 3, 2012.  Docket 88-56.  He explained he wanted to have sandwiches

in his sack lunches, as he had at MDSP.  Id.  The nurses told him to discuss

this with the meal provider (CBM) but Mr. Gard "refused to consider this."  Id.

Mr. Gard was nevertheless scheduled for a consult with the dietician.  Docket

88-79.

Mr. Gard saw the physician's assistant at the SDSP on April 4, 2012.

Docket 88-67.  He reported he continued to skip breakfast.  Id.  Mr. Gard

explained that in Springfield (MDSP), his diabetic snack sacks contained

sandwiches but he was not getting sandwiches in Sioux Falls.  Id.  Mr. Gard

---

http://www.medilexicon.com/medicalabbreviations.php?keywords=HS&search=abbreviation (Last checked January 28, 2016).

further explained that without the sandwiches he got too hungry and needed to supplement his diet with items from the commissary.  Id.  Mr. Gard insisted then and insists now he did not eat all the items he purchased from the commissary (Docket 130, ¶ 18) and that he followed the "Guide to Healthful Commissary Choices" (Docket 114-1)when he did eat the items he purchased. Docket 130, ¶ 18.

The physician's assistant refused to add sandwiches to the sacks because Mr. Gard had lost weight since coming to the SDSP and his blood sugars had improved.  Docket 88-67.  Instead, the PA encouraged Mr. Gard to use portion control and quit using the commissary to supplement his diet.  Id. Mr. Gard told the PA he could not control his appetite, so the PA was not hopeful Mr. Gard would "take the recommendation seriously."  Id.

When Mr. Gard reported to SDSP health services on April 25, 2012, he again indicated he wanted a meat sandwich in his diabetic snacks because he was "unable to control his hunger."  Docket 88-68.  Mr. Gard explained "if he does not have a diabetic snack including a sandwich . . . he needs to eat commissary items for his hunger.  Patient continues to state he is unable to control his hunger and that is the reason why he is asking for a healthier sandwich sac."  Id.  The physician's assistant added an order for a meat sandwich in Mr. Gard's diabetic snack.  Id.

When Mr. Gard returned to SDSP health services in October, 2012, he reported he was being compliant with his meds and routinely checking his

blood sugar.  Docket 88-40.  He also reported he was "attempting to make healthier choices in terms of the snacks he eats."  Id.  The defendants provided a printout of Mr. Gard's commissary purchases during the majority of his stay at SDSP (March 2012 through March, 2013).  See Docket 88-7, ¶ 32 and Docket 88-18.  The printout reveals many purchases of items such as candy and cookies.  Id.

Mr. Gard returned to MDSP in early 2013.  Docket 88-41.  His blood sugars were in "poor control."  Id.  In April, 2013, Mr. Gard continued to be non-compliant with his morning insulin because he did not want to check his blood sugars in the morning. Docket 88-42.  In August, 2013 Mr. Gard reported his blood sugars were "well controlled."  Docket 88-43.  He reported a concern to health services, however, about his diabetic snacks.  Id.  He did not like peanut butter or the ham salad sandwiches he was receiving in his sack lunches.  He wanted fruit in his sacks instead.  Mr. Gard disputes the accuracy of this medical note.  Docket 130, ¶ 23.  Id.  PA Hanvey stated he would recommend fruit in the diabetic sack "if possible" but otherwise continue with sandwiches and milk if possible.  Id.  Mr. Hanvey also recommended that Mr. Gard continue with the 2800 calorie ADA diabetic diet.  Id.

Jenifer Bemboom attempted to meet with Mr. Gard in 2013, but Mr. Gard refused her request for a consult.  Docket 88-1, ¶ 15.  Ms. Bemboom completed a nutrition assessment in October, 2013.  Docket 88-69. Ms. Bemboom noted Mr. Gard refused to eat CBM meals and refused to

cooperate in getting a current weight.  Id.  Mr. Gard commented he believed the only way to control his diabetes was to not eat CBM meals.  Id.

In February, 2014, Mr. Gard again reported to MDSP health services. Docket 88-70.  He refused to check his blood sugars and reported he received sack lunches and "supplements his other meals due to the fact he does not like what is prepared in the kitchen for regularly scheduled meals."  Id.  At this visit, PA Hanvey told Mr. Gard he would not be allowed to sit and wait for everyone else to finish their fingersticks but must stand and wait in line like everyone else.   Hanvey also told Mr. Gard if his blood sugars exceeded 250 he would not be issued a diabetic snack.  Id.  This did not please Mr. Gard so he threatened to refuse to test his blood sugar or take his insulin.  Id.  PA Hanvey warned Mr. Gard his refusal to comply would "be a direct danger to health however this was his decision."  Id.  During this visit, PA Hanvey wished to adjust Mr. Gard's insulin dose, but Mr. Gard also refused that attempt to control his diabetes.  Id.

In May, 2014 Mr. Gard again reported to MDSP health services.  Docket 88-58.  He again indicated he did not eat breakfast as recommended by his medical providers.  Id.  He informed PA Hanvey the food was unacceptable so he ate snacks and commissary food.  Id.  He also informed PA Hanvey he had stopped taking two of his diabetes medications (Metformin and Glucotrol) because "they did not improve his diabetes."

41

In June, 2014, Mr. Gard again presented at the MDSP health services. Docket 88-71. He reported trying to decrease the amount of "carbs" eaten at each meal while eating more protein and fiber. Id. This worked for only a few weeks at a time before Mr. Gard's cravings got out of control and he "ate things that were not on his diet." Id. PA Hanvey instructed Mr. Gard to spread his sack lunches out to avoid hypoglycemia and to curb his food cravings, but "he is to eat his sack lunch on the day it is given . . ." Id.

By August, 2014, Mr. Gard continued to complain about the quality of the food at MDSP. Docket 88-72. Mr. Gard reported to Dr. Wallinga on August 7, 2014, that the food was "very poor in quality and does not meet diabetic standards. Apparently the menu does not always correlate to what is being served. He tells me breakfast is too high in carbs and he therefore does not eat breakfast at all. He will sometimes avoid other foods because of poor quality or content. He does eat refried beans and tortillas from the commissary. He will have sudden urges where he is tremendously hungry which he states he cannot control." In response, Dr. Wallinga observed "need to improve his understanding of carbs and food portions in order to better control his blood sugars." Docket 88-72.

Mr. Gard saw Dr. Boschee at MDSP health services in December, 2014. Docket 88-73. Dr. Boschee noted Mr. Gard had been instructed about healthy eating habits and given handout materials on the subject, so he inquired about Mr. Gard's commissary purchase report which indicated "significant" food

42

purchases.  Id.  Mr. Gard claimed that though he ate refried beans and tortillas "quite a bit" he was "not necessarily eating everything" but that he used some of the commissary food to "pay people back."  Id.

The South Dakota Department of Corrections has a policy that prohibits inmates from transferring property (including commissary items).  Docket 88-3, ¶ 14.  According to SDDOC Policy 1.3.C.4, "personal property may not be transferred between inmates without the approval of the Warden or designee." Id.  Mr. Gard, despite his claim that he gives away his commissary items rather than eating them himself, identifies only one instance in which he has been disciplined for giving away his commissary.  Docket 55, ¶ 95.  Dr. Boschee expressed doubt about Mr. Gard's claim he was giving away rather than eating the commissary items when Dr. Boschee stated, "I did review his commissary sales report with him.  Whether he is buying this and giving this back to other people is always going to be up for debate.  According to his commissary sales report he is not following a diet that would be conducive to lowering his blood sugars and his hemoglobin A1c.  He has handouts that Dr. Wallinga had given him for diet."  Docket 88-73.

The defendants attached Mr. Gard's commissary sales report for the first few months of 2015, which reveals he continues to purchase food his physicians have repeatedly advised him to avoid.  Docket 88-36.

On February 26, 2015, Mr. Gard was transported to the emergency room with "increased weight gain, edema, and shortness of breath."  Docket 88-80.

43

Mr. Gard reported that for four or five days before his ER visit, he had been vomiting and not able to keep his medication down, including his furosemide.[21] The ER physician recommended that Mr. Gard take his medications under supervision  but "Rex refuses to do that because he does not wish to come up to medical at those times. He already comes to medical 3 times a day for his insulin. He never eats breakfast nor gets up to take his meds very early." Id. Mr. Gard received a disciplinary report regarding his refusal to follow these instructions.  Docket 88-33.  The nurse described the incident as follows:

> Gard, Rex was called to medical to inform him of the medical changes ordered by the provider as a treatment plan from his visit at the ER today.  Gard was asked to bring all of his medications to medical.  Gard brought up the medication pouches with no envelopes.  He was informed the provider ordered daily weights and was instructed on a time to complete this, he was informed certain medications would be issued through the med pass line now versus them being a self med, and he was informed of his new diet change.  Gard stated "nope, I'm not doing this. I am not being treated like a kid."  He then stood up from the exam table and proceeded toward the exit.  I prompted him to return and take his medications (that were still able to stay self medication) he refused by shaking his head.  He continued to exit medical.

Docket 88-33.

The "new diet" change appears to be the addition of low salt to the diabetic diet.  The emergency room physician urged Mr. Gard to eat a "low salt diabetic diet."  Appendix F (produced by the defendants in response to this court's order dated December 23, 2015).  On February 28, 2015, the nursing

---

[21]     Furosemide is the generic name for the diuretic Lasix.  www.rxlist.com (last checked January 29, 2016).

staff addressed Mr. Gard's continuing non-compliance with his diabetic diet

plan, shortly after his visit to the emergency room.  Id.  The nurses noted

"educated pt. that he would then remain on the diet as ordered.   . . . phone

call received from kitchen regarding pt.  This recorder asked about diet.

Dietary responded that pt. refusing tray and will just substitute for regular so

they don't have to hear him complain about diet.  Will talk to pt. when he

comes up for fingersticks."  See Appendix G (produced in response to this

court's order dated December 23, 2015).[22]

### d. Eyeglasses claim.

The defendants do not dispute Mr. Gard's glasses were lost, but assert

Mr. Gard should have been wearing his glasses during the transport to Sioux

Falls in which he claims his glasses were lost.  Docket 88-3, ¶¶ 16-17.[23]

_____

[22]    The court has also considered the affidavits of David Van Wagner (Docket
8-13) and Ernest Wayne Bowen (Docket 8-14) which Mr. Gard submitted in
support of his motion for temporary restraining order.  Mr. Van Wagner and
Mr. Bowen work in the MDSP dining hall.  Id.  Both of these affidavits address
the sufficiency/quality of the diabetic trays at MDSP.  Id.  Both affidavits,
however, contain mostly inadmissible hearsay about what others at MDSP
allegedly told these inmate kitchen workers.  Id.  After the inadmissible
information is excised, the affidavits indicate the diabetic trays at MDSP are, in
these inmate kitchen workers' opinions, the same as the "bland" or "heart
healthy" trays, contain too many carbohydrates, and are so unappetizing that
most inmates choose to forego their special diet trays.  Id.

[23]    In his amended complaint, Mr. Gard asserts the glasses were lost in
February, 2013.  Docket 55, ¶ 48.  He alleges he grieved the lost glasses but
does not specify when.  Id. at ¶ 49.  Mr. Gard submitted a copy of his
administrative remedy (AR) to Warden Dooley as an attachment to his motion

Warden Dooley explains with the exception of non-prescription sunglasses, inmates are allowed to wear their glasses during transports.  Id.

Mr. Gard's glasses were replaced.  Docket  88-19.  Mr. Gard filed a grievance because he was not satisfied with the manner in which the new glasses fit his head.  Docket 88-19.  Jessica Luke instructed him to "put in a kite to the eye doctor to get measured for larger glasses."  Id.  Mr. Gard had not followed instructions to kite the eye doctor, so he had not been scheduled to see him to get his new glasses adjusted.  Id.

The defendants assert that once Mr. Gard "followed the proper steps" he was scheduled to see the eye doctor.  Docket 88-7, ¶ 86.  Mr. Gard asserts he kited to see the eye doctor, but received no response.  Docket 130, ¶ 31.

Among the documents produced in response to this court's order dated December 23, 2015, was Mr. Gard's May 3, 2014, kite in which he explained the glasses he received in August, 2013, did not fit.  Appendix H.  He then had

---

for a temporary restraining order.  Docket 8-7.  The administrative remedy is dated March 27, 2013.

The defendants have provided information indicating that in October, 2013, Mr. Gard grieved the fact that his replacement glasses did not fit.  See Dockets 88-19 and 88-64.  The July 30, 2013 optometrist's note indicates Mr. Gard was seen on that date because his bifocal lenses were no longer effective and he needed trifocal lenses.  See Appendix I.  There is no mention in the July 30, 2013 note that Mr. Gard's old glasses were lost in transport or that Mr. Gard had been without glasses altogether since February, 2013.  In fact, there is no mention in the medical records that the glasses were lost in transport until June, 2014, when Mr. Gard was trying to persuade Dr. Tornsey to allow him to have new glasses sent in from "the street" rather re-ordering a larger size of the institutional style frames.  See Docket 88-75.

46

an appointment with the eye doctor.  Docket 88-74.  When Mr. Gard saw the eye doctor, (May 13, 2014) Dr. Tornsey adjusted the temples, frame and earpiece.  Docket 88-74.  Dr. Tornsey noted "they were a little short behind the ears but they stayed up well on his face."  Id.  Mr. Gard also complained the trifocal lenses had not been put in, so Dr. Tornsey located the trifocal lenses and put them in the frames.  Id.  Mr. Gard did not like where the trifocal lines fell.  Id.  Dr. Tornsey asked Mr. Gard to stay for another eye exam because by then it had been a year since his last eye exam.  Mr. Gard refused, removed the glasses and left Dr. Tornsey's office.  Id.  Gard disputes he complained about anything, but rather explains he left the office because "for whatever reason" Dr. Tornsey became agitated with him, snapped the lenses out of the frames, and threw the frames on the counter.  Docket 130, ¶ 31.

When Mr. Gard returned to Dr. Tornsey on June 3, 2014, Dr. Tornsey noted Mr. Gard  "really only wants a pair for reading and horse hair tying but they have to fit his head."  Docket 88-75.  Mr. Gard further asked Dr. Tornsey "multiple" times to write a medical order which would allow Mr. Gard to get his glasses sent in from the outside.  Id.  Dr. Tornsey declined to do so but instead ordered "every size of Nick frame they make to see if they make a 58 or 60 eye if they do and I can fit it on him comfortably we will go that route."  Docket 88-75.  This medical note is the first time Mr.  Gard mentioned to the eye doctor that his first pair of glasses (which he had brought from the outside) were lost during the transport.  Id.  Mr. Gard returned on June 24, 2014, to be

fit with the new frames. Docket 88-76.  Dr. Tornsey "measured the new trifocal height with this frame and ordered it." Id.  Misty Tolsma avers that Mr. Gard came to the eye doctor in July, 2014, to pick up his glasses but he refused to try them on to assure they fit correctly.  Docket 88-7, ¶ 93.  When Mr. Gard returned in August, he likewise "did not want his glasses checked."  Docket 88-77.  Mr. Gard explains "it took more than 2 ½ years after the DOC lost his glasses to get replacements that actually fit him." Docket 130, ¶ 31.

Ms. Tolsma also explains that though Mr. Gard had a medical order for tinted glasses which was issued in March, 2010 (Docket 89-42) the order was only valid for one year, was not renewed, and has now expired.  Docket 88-7, ¶ 95-96.  Mr. Gard asserts he has "now gotten another med order for tinted glasses, but DeJong will not allow [him] to have his glasses back . . ." Docket 130, ¶ 34.  Mr. Gard did not provide a copy of the subsequent medical order for tinted glasses, and the court has been unable to locate it in the 2,900 pages of medical records which have been produced by the defendants.[24]

---

[24]     In his response to the defendants' statement of undisputed facts, Mr. Gard cites a new medical order for tinted glasses and refers to his own "Exhibit SJ 1, 1A." Docket 131, ¶ 142.  The court has been unable to locate such an exhibit in the record.

### e. **Retaliation claim.**

Mr. Gard's amended complaint alleges the defendants retaliated against him in several ways for filing prison grievances.  The following information has been submitted at the summary judgment stage by the parties:

First, Mr. Gard asserts that in May, 2014, Major Tjeerdsma attempted to persuade a fellow inmate to implicate him (Gard) in an incident which caused the fellow inmate to be placed in the SHU in exchange for the fellow inmate's exoneration.[25]  Docket 55, ¶ 85.  The defendants admit Major Leland Tjeerdsma (in charge of special security) probably interviewed Mr. Gard's fellow inmate (Brian Holzer) while Mr. Holzer was in the SHU in May, 2014.  Docket 88-6, ¶¶ 3-5.  Major Tjeerdsma has averred, however, that he has no power to "cut a deal" with an inmate once he has been found guilty of a rule infraction that has resulted in his placement in the SHU.  Id., ¶ 6.  Major Tjeerdsma further denies that he took any action against Mr. Gard as a result of a supposed interview or deal with Mr. Holzer.  Id. ¶ 7.

Mr. Gard's amended complaint (Docket 55) claimed the defendants retaliated against him because Tammy DeJong seized fruit from Mr. Gard's room (Docket 55, ¶¶ 86-88).  Unit Coordinator Tammy DeJong conducted rounds on the morning of June 6, 2014.  Docket 88-2, ¶ 3.  She noticed items

_____

[25] Mr. Gard cite to Mr. Holzer's affidavit to support this claim (indicating it is "exhibit AA" to Docket 55, his amended complaint) but the court has been unable to locate such an exhibit to Docket 55.

sitting on a desk where Mr. Gard kept his belongings.  Id.  Included were the following food items:  two oranges, a sandwich, and crackers.  Id.  Mr. Gard claims he had received the food in his sack lunch only a few moments earlier. Docket 130, ¶ 32.  When Ms. DeJong questioned Mr. Gard about the food, he indicated he intended to eat it that evening because he did not want to eat at the "chow" hall.  Docket 88-20.  Mr. Gard claims he told Ms. DeJong he was saving the food for between meals to prevent low blood glucose symptoms. Docket 130,¶ 32.  Ms. DeJong contacted MDSP health services but was informed "inmate is not getting sack meals to avoid eating in the chow hall." Id. Ms. DeJong confiscated the food items from Mr. Gard's desk.  Id.  Mr. Gard was insistent he could decide when to eat his medical snacks and told Ms. DeJong he would put his medical snacks in a drawer out of her sight next time.  Id. ¶ 6.

Ms. DeJong decided to issue a disciplinary report.  Id. ¶ 7.  In her affidavit, she cited the following reasons in support of her decision to issue the disciplinary report for Mr. Gard having food in his room:  Though Mr. Gard claimed health services told him he could eat his medical snacks "as necessary," the medical record indicates his medical sack lunches were to be eaten on the same day they were issued.  Docket 88-71.[26]  Mr. Gard was again

---

[26]     The court notes the date of the medical record with this instruction is June 13, 2014, about a week *after* the incident in which Ms. DeJong confiscated the sack lunch items from Mr. Gard's room.

reminded of this admonition in response to his grievance of the ice machine being broken, because he wanted to store his diabetic snacks there.  Docket 88-21.  Mr. Gard was instructed to store his diabetic snacks in the officers' fridge and that that "any sacks not consumed the same date issued will be destroyed."  Docket 88-22.  Warden Dooley and Ms. DeJong also explain why inmates are not allowed to keep food such as fruit in their individual rooms. "In addition to the obvious concerns about the health risks posed by allowing inmates to improperly store food in their rooms, there are also security concerns if any inmate were allowed to keep fresh fruit in his cell.  Such fruit, if allowed to ferment, could be used by inmates to make homemade 'hooch.' " Docket 88-3, ¶ 23, Docket 88-2, ¶ 12.  Mr. Gard recognized the risk of improperly storing food that needed to be refrigerated when he complained about the broken ice machine.  Docket 88-21.

Mr. Gard also alleges the defendants retaliated against him by taking away his tinted safety glasses (Docket 55, ¶ 112).  The defendants concede Ms. DeJong removed tinted safety glasses from Mr. Gard's room on November 3, 2014.  Docket 88-2, ¶ 13.  Ms. DeJong explains in her affidavit, however, before she removed the tinted glasses from Mr. Gard's room, she checked the Comprehensive Offender Management System (COMS) to determine whether Mr. Gard had a current medical order for them.  He did not.  Id.

She also contacted MDSP health services to inquire whether Mr. Gard had a current medical order for tinted glasses.  Id. at ¶ 14.  Health services

likewise indicated Mr. Gard did not have a current medical order for tinted glasses.  Id. at ¶ 15.  Mr. Gard later showed her the medical order from 2010, but Ms. DeJong informed Mr. Gard that order had expired and needed to be renewed.  Id.  Ms. DeJong explains the old prescription was written at a time when Mr. Gard worked in an area of the prison where he no longer works (the court notes Mr. Gard was apparently a welder, (see Appendix J), and there is no longer a need for him to possess tinted safety glasses for work.  Docket 88-2, ¶ 16.  Mr. Gard never asked for a renewal of the order during any of his visits with the eye doctor between 2010 and 2014.  Docket 88-7, ¶ 96, Docket 88-74 through 88-77.

Next, Mr.  Gard asserts he was punished for filing grievances (Docket 55, ¶¶ 89-97).  Specifically, Mr. Gard indicates the defendants retaliated against him by rejecting or denying his grievances.  Id.  In response the defendants cite policy  SDDOC 1.3.E.2.[27]  The policy allows the Administrative Remedy Coordinator to serve the inmate with a form (Notice of Rejection of

---

[27]    This policy is referenced by a cite to defendants' exhibit 77.  The court has been unable to locate exhibit 77 in this record.  The language of the policy was also quoted in Warden Dooley's affidavit, Docket 88-3, ¶ 24.  Mr. Dooley says policy 1.3.E.2 specifically states "if it is determined by the Administrative Remedy Coordinator and the Warden that the inmate is abusing the procedure, the Administrative Remedy Coordinator will provide the inmate with a 'Notice of Rejection of Request for Administrative Remedy."  Docket 88-3, ¶ 24.  The court located the policy on the DOC website.  A copy of the form referenced by the Warden is found, but the language cited by him is not.  See https://doc.sd.gov/documents/about/policies/Administrative%20Remedy%20for%20Inmates.pdf (last checked February 4, 2016).

Administrative Remedy) if the inmate is determined to have abused the grievance procedure.  Id.  The defendants note Mr. Gard's institutional file contains several such forms which notified Mr. Gard why his grievances were rejected.  Docket 88-3, ¶ 24, Docket 88-24 through 88-27.

The defendants also deny they retaliated against Mr. Gard for filing a grievance about his expired commissary items (Docket 55, ¶¶ 93-97).  The defendants assert DOC policy prohibits inmates from transferring or giving away personal property.  Docket 88-3, ¶ 14.[28]  Gard admits that when he filed a grievance about the expired commissary items, staff replaced some items but he told prison officials he had given away the other expired items.  Docket 55, ¶ 94.  Because Gard admitted he had violated policy, the defendants argue, he can hardly now claim the write up was retaliation for filing a grievance.

Defendants also deny they retaliated against Mr. Gard during or after his time in the SHU in between September 1-5, 2014.  Though Mr. Gard asserts the defendants denied his request to visit with the staff attorney while he was in the SHU (Docket 55, ¶ 100) the defendants have produced the attorney visit request lists for the dates before, during and after the week Mr. Gard was in

---

[28]    Warden Dooley's affidavit (Docket 88-3) refers to DOC policy 1.3.C.4, which states in relevant part:  "[i]nmate personal property may not be transferred between inmates without the approval of the Warden or his/her designee."  Policy 1.3.C.4, Section IV Procedures, Part 1.D.  The policy is available on the South Dakota DOC public website, https://doc.sd.gov/documents/about/policies/Inmate%20Personal%20Property.pdf (last checked February 4, 2016).

the SHU  (Dockets 88-28 through 88-32).  Mr. Gard's name appears on the list for the times before and after his time in the SHU, but his name does not appear on the list during the week of September 1-5, 2014.  Therefore, the defendants assert, they did not retaliate against him by failing to call his name to see the attorney.  Rather, he was not called to see the attorney while he was in the SHU because he had not asked and was never scheduled to see the attorney in the first place.  See also Docket 88-3, ¶¶ 26-28.

The defendants also deny they retaliated against Mr. Gard by delaying the return of his property after his release from the SHU in September, 2014. The defendants submitted the affidavit of the property officer (Randy Stevens), Docket 88-5.  Mr. Stevens explains he contacted unit staff the day Mr. Gard was released from the SHU.  Id., ¶ 4.  He told unit staff to send Mr. Gard to retrieve his property, but that Mr. Gard would need extra time to consolidate his things into the mandatory three box limit.  Id. [29]   At the time of his release from the SHU, Mr. Gard had eight boxes of property.  Id., ¶ 5.  Mr. Gard, however, refused to report to the property office but instead indicated he would "take care of the problem in another manner."  Id., ¶ 7, Docket 55, ¶ 103. Mr. Gard explains that in the end, there was no excess property because

---

[29]    Mr. Stevens referred to policy OM 3.3.C.3 which limits inmates to three transport boxes, 40 pounds maximum.  Docket 88-5, ¶ 5.  Neither the defendants nor Mr. Gard provided the court with a copy of the policy.  Viewing the facts most favorably to Mr. Gard, the court will assume the three box maximum excludes legal materials.

everything in excess of the "three box limit" was legal work and the relevant policy puts no limit on legal work.  Docket 130, ¶ 40.

By the time Mr. Stevens left work on the day in question,  Mr. Gard had not arrived at the property office to claim his belongings.  Docket 88-5, ¶ 8. Nevertheless, after Mr. Stevens left work for the day, Mr. Gard complained to Tammy DeJong about not having his property back.  Docket 88-2, ¶ 21. Ms. DeJong contacted the Associate Warden (Susan Jacobs).  Id. at ¶ 22. Ms. DeJong made arrangements to have another staff member (Corporal Cropper) accompany Mr. Gard to the property office to retrieve his legal work and hygiene items for the weekend.  Docket 88-2, ¶ 22.  Mr. Gard was not satisfied with having only part of his belongings for the weekend, but Corporal Cropper's  time was limited because only one other officer was available to cover his unit.  Docket 55, ¶ 107.  Mr. Gard did not get the rest of his property until the following Tuesday, September 9.  Id. ¶ 108.

The defendants likewise deny that officer Stevens retaliated against Mr. Gard by rejecting a book Mr. Gard ordered from the outside.  Officer Stevens explains he mistakenly believed all books were supposed to be purchased through the MDSP banking system.  Docket 88-5, ¶ 9.  Officer Stevens initially (on November 13, 2014) rejected the books Mr. Gard ordered because Mr. Gard did not purchase the books through the inmate banking system.  Id., ¶ 10; Docket 55, ¶ 113.  When Officer Stevens learned inmates could purchase books using funds from outside accounts, he immediately

made arrangements to provide the books to Mr. Gard.  Docket 88-5, ¶ 11.
Mr. Gard received the books on December 2, 2014.  Id.

In response to Mr. Gard's final retaliation claim (denial of access to his medical records) the defendants explain Mr. Gard's own actions necessitated limitations on his ability to view his records.  Docket 88-7, ¶ 54-56. If Mr. Gard had a negative interaction with health services staff, he returned the next day insisting to see how the incident was reported in his records.  Id. at 55.  This behavior interfered with staff's ability to perform their daily duties.  Id. at ¶ 56. They agreed, therefore, that limiting Mr. Gard's requests to view his records to once per week was reasonable.  Id.  Mr. Gard denies his records requests were excessive (Docket 130, ¶ 48) and cites the written kites he submitted which contained such requests.  Docket 114-5.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp.,

600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie

if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence

of any genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at

256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions

of fact and properly address the opposing party's assertions of fact, as required

by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for

purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.  Factual

disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A

Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice &

Procedure § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  Though *pro se* litigants like Mr. Gard are entitled to a liberal construction of their pleadings, Fed. R. Civ. P. 56 remains equally applicable to them.  Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).

**B.    The Law of Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Gard must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511,

526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' "  Stanton v. Sims, ___ U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 761, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))).  " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' "  Stanton, 134 S. Ct. at 5.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing

59

bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818). Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Id. Even then, the Court has pointed out that Fed. R. Civ. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence. Id.

## C.    Deliberate Indifference to a Serious Medical Need

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015). This prohibition includes prison officials' deliberate indifference to the medical needs of inmates. Id. "Deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true

60

whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05.

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Gard is required to show (1) that he suffered objectively serious medical needs and (2) that defendant actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more . . . than gross negligence." Saylor v. Nebraska, __ F.3d __, 2016 WL 362230 (8th Cir. January 29, 2016) at  *3 (citing Fourte v. Faulkner County, Ark., 746 F.3d 384, 387 (8th Cir. 2014)) (other citations omitted). "Even medical

61

malpractice does not automatically demonstrate deliberate indifference." Id.
(citing Jackson v. Buckman, 756 F.3d 1060, 1065-66 (8th Cir. 2004)).  For
claims against non-medical defendants, Mr. Gard must allege and show "the
supervisor personally participated in or had direct responsibility for the alleged
violations or that the supervisor actually knew of, and was deliberately
indifferent to or tacitly authorized the unconstitutional acts." Saylor, 2016 WL
352230 at * 4 (citing McDowell v. Jones, 990 F.2d 433, 435 (8th Cir. 1993)).

      "A serious medical need is one that has been diagnosed by a physician as
requiring treatment, or one that is so obvious that even a layperson would
easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at
784.  To establish liability, "the official must both be aware of facts from which
the inference could be drawn that a substantial risk of harm exists, and he
must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).
In other words, " ' the failure to treat a medical condition does not constitute
punishment within the Eighth Amendment unless prison officials knew the
condition created an excessive risk to the inmate's health and then failed to act
on that knowledge.' " Coleman, 114 F.3d at 785 (citing Long v. Nix, 86 F.3d
761, 765 (8th Cir. 1996)).

      A plaintiff asserting deliberate indifference "must show more than even
gross negligence"—he "must establish a 'mental state akin to criminal
recklessness:  disregarding a known risk to the inmate's health.' " Allard, 779
F.3d at 771-72.  But, "a total deprivation of care is not a necessary condition

for finding a constitutional violation: 'Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.' " Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990)).  A plaintiff can also show deliberate indifference by demonstrating that a defendant denied access to or intentionally delayed medical care.  Allard, 779 F.3d at 772.

Mr. Gard claims the defendants were deliberately indifferent to his serious medical need (diabetes) because they did not honor his doctor's order for diabetic shoes and socks in a timely manner, and because his diabetic diet has been inadequate.  He also asserts they failed to timely provide him with glasses that properly fit his head.  The court addresses each of these contentions separately.

### 1. Diabetic shoes.

Mr. Gard has worn New Balance tennis shoes from the beginning of his time in the South Dakota Department of Corrections because the standard issue Velcro tennis shoes do not fit his large feet.  When Mr. Gard was diagnosed with diabetes in March, 2010, however, he received a medical order for "diabetic shoes."  As it happens, "diabetic shoes" and New Balance shoes are one in the same.  The issue in this lawsuit is whether Mr. Gard received the diabetic/New Balance shoes with sufficient regularity and frequency after he received the medical order in March, 2010.

Viewing the facts most favorably to Mr. Gard, it appears Mr. Gard received New Balance shoes in October, 2009.  He did not receive another pair in March, 2010 when he received his medical order for diabetic shoes because it had been less than a year since his last pair was issued.  There are "receipts" in the record for shoes on August 5, 2010 and February 13, 2014.  Though there is no "receipt" in the record, Muriel Namminga avers Mr. Gard received another pair on March 12, 2015.

Mr. Gard struggled to get new shoes during 2012 after he was transferred to SDSP.  He grieved the issue, and in July, 2012, Warden Weber indicated in an administrative response the shoes had been ordered.  There is no evidence in the record, however, about when (if ever) the shoes to which Warden Weber referred in the July 2012 AR were received by Mr. Gard. Mr. Gard asserts he went three and a half years without getting new shoes. Gard affidavit, Docket 130, ¶ 1.  Viewing the facts in a light most favorable to Mr. Gard, therefore, the court assumes for purposes of this opinion that the shoes to which Warden Weber referred in the July 2012 AR response were not received by Mr. Gard until February 13, 2014.

That Mr. Gard went for three years and one half years (August, 2010-February, 2014) without his diabetic/New Balance shoes, however, is not the end of the matter.  "To be liable for deliberate indifference, a defendant must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference."
Farmer, 511 U.S. at 837.  To prevail on his deliberate indifference claim,
Mr. Gard must show (1) the named defendants were aware that having the
same pair of shoes for three and a half years could cause a substantial risk of
serious harm to Mr. Gard; and (2) the named defendants drew the inference
that a serious risk of harm existed because Mr. Gard had the same pair of
shoes for three and a half years.   Mr. Gard has not made this showing.

First, it is not clear from the record that any named defendant was
personally aware Mr. Gard's diabetic shoe order went unfilled for three and
one-half years.  For the time he was at the SDSP, there was obviously
confusion about who ordered and provided diabetic shoes.  Mr. Gard provided
the defendants with a copy of his medical order for diabetic shoes, yet the DOC
response to Mr. Gard's informal resolution request was "health services does
not provide orders for diabetic shoes . . ." See Docket 8-6.  Though this lack of
coordination and communication within the DOC may rise to the level of
negligence, that is not enough to prevail on a claim for deliberate indifference
to a serious medical need.  Allard, 779 F.3d at 771-72.  "Without any evidence
that [the defendant] 'actually knew' [the plaintiff] experienced serious side
effects . . . or that she deliberately disregarded such a risk, she did not violate
his Eighth Amendment rights." Laganiere v. County of Olmstead, 772 F.3d
1114, 1117 (8th Cir. 2014) (citing McRaven v. Sanders, 577 F.3d 974, 980 (8th
Cir. 2009)).

Here, there is insufficient evidence that any one of the named defendants actually realized Mr. Gard's medical order for diabetic shoes went unfilled for such an extended period of time. Though he grieved the diabetic shoe issue to Warden Weber at SDSP and Warden Weber responded that the shoes had been ordered, the record goes silent thereafter.  Mr. Gard returned to MDSP in early 2013, and there is no evidence that anyone at that facility was aware he did not receive the shoes that had been ordered while he was at SDSP.

"[D]eliberate indifference depends on the mental state of the defendants." Williams v. Boozer, 526 Fed. Appx. 668, 670-71 (7th Cir. April 16, 2013).  In Williams, the inmate plaintiff sued two prison guards for deliberate indifference because he claimed they forced him to wear work boots against his doctor's orders. The inmate was diabetic and had a medical order to refrain from wearing the work boots.  Despite the inmate's claim he believed he had to wear the boots because of his job as a prison porter, the guards testified they did not force him to work. Id. at 670.  They further testified they were unaware of the health risk the boots presented to the inmate.  Id.  The Seventh Circuit affirmed judgment in favor of the guards because "guards who are unaware of a risk cannot be deliberately indifferent to it."  Id. at 671.

When an inmate alleges that a delay is the constitutional deprivation, the objective seriousness of the deprivation is measured by reference to the effect of the delay.  Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997).  In addition to showing the defendants knew he went without new shoes for three

66

and one-half years, therefore, Mr. Gard must also show the effect of the delay

in receiving the shoes.  See Acrey v. Zestos, 2014 WL 4410151 (E.D. Mich.,

Sept. 8, 2014).  In Acrey, the plaintiff inmate sued a prison physician and

administrator for deliberate indifference for delay in receiving diabetic soft

shoes.  Id. at * 5.   The plaintiff had previously been diagnosed with diabetes

and neuropathy, but the prison physician did not believe he needed special

shoes.  Id.  The court found no deliberate indifference because "during the

entire time  . . .none of the symptoms of neuropathy were either reported by

plaintiff or found to exist when examined by medical staff.  Plaintiff received

regular and frequent medical attention, he never reported any actual foot

problems during those sessions, and examinations of his feet consistently

found that his feet were normal and that his sensations in his feet were intact

bilaterally." Id. at 6.

       In  Askew v. Davis, 613 Fed. Appx. 544 (7th Cir. 2015) the inmate

plaintiff likewise claimed deliberate indifference for failure to timely provide

diabetic shoes.  In Askew, the inmate plaintiff sued the warden and prison

medical staff because it took a year before he received the diabetic shoes he

requested upon arrival in prison.  Id. at 545.  The inmate alleged that during

the year delay, he experienced pain, numbness and swelling in his feet.  Id. at

546.  The court affirmed summary judgment in favor of the defendants because

"even if [plaintiff] was in pain from diabetic neuropathy when he first requested

the shoes, nothing in the record suggests that his shoes were the cause." Id.

at 547.  See also, Matthews v. Pallito, 2014 WL 4805333 at * 12 ("Matthews had not shown that any delay in receiving diabetic shoes caused the harm that he complains of.") (citing cases) (D. Vermont, Sept. 26, 2014).

Most importantly, there is insufficient evidence Mr. Gard alerted any of the named defendants that the three and one-half year gap between new shoes caused harm to his diabetic condition or his feet, let alone that any of the defendants deliberately disregarded such harm.   A review of the medical records during this time frame (August 2010 through February 2014) reveals that Mr. Gard did not inform his medical providers his shoes were worn out, or that he or they attributed any foot problems to his worn out shoes.  See Docket 88-38 through 88-46.

As to Mr. Gard's diabetic shoe claim, the record before the court does not support a finding that any defendant was subjectively aware there was an excessive risk to Mr. Gard's health followed by a failure to act on that knowledge.   Coleman, 114 F.3d at 785.  As such, Mr. Gard has not established his claim for deliberate indifference.  The defendants' summary judgment motion for qualified immunity on this claim should be granted because defendants were not "plainly incompetent" with regard to Mr. Gard's Eighth Amendment rights.  Hunter, 502 U.S. at 229.

### 2. Diabetic socks.

Viewing the facts most favorably to Mr. Gard, he received a medical order for diabetic socks in March, 2010 but did not receive them until May, 2014.  In

April, 2010, he reported to health services that the socks he had received "barely covered his heel," that he had been unable to get diabetic socks, and that the lady in the laundry told him he would have to wear whatever they had. The PA assured Mr. Gard he would try to get him some socks that fit correctly. Docket 88-39.   Mr. Gard did not mention his socks again to his health care providers at MDSP before he transferred to SDSP in January, 2012.

When Mr. Gard arrived at SDSP in January, 2012, he tried to obtain diabetic socks from the medical staff there, but they told him his order for diabetic socks at MDSP had expired.  Docket 88-56.  When Mr. Gard filed a grievance on the issue, he was then instructed "health services does not provide orders for diabetic . . . socks."  Docket 8-6.  At the administrative level, however, Warden Weber instructed Mr. Gard that "your request for socks will have to go through health services."

Mr. Gard initially did not receive diabetic socks at the SDSP because the order for the socks had expired.  When he filed a grievance about the socks, however, it appears there was a complete internal breakdown in communication regarding who bore the responsibility to decide whether Mr. Gard's order for diabetic socks should be renewed and if so, who bore the responsibility to obtain the diabetic socks for Mr. Gard.  Upon his return to MDSP, Mr. Gard still did not have a current order for diabetic socks, so he received regular socks from the laundry supervisor.  Docket 88-4, ¶ 14.  When, in April, 2013, Mr. Gard complained to the laundry supervisor that the regular

socks were too small, she purchased extra-large socks for him from Wal-Mart. At that time, she believed there was no order in place for Mr. Gard to have diabetic socks and that the Wal-Mart socks were appropriate "diabetic" socks in any event.  Neither Mr. Gard nor anyone else told her otherwise.

Mr. Gard reported swelling in his legs in December, 2013, but neither he nor his medical providers attributed the swelling to his Wal-Mart socks or the lack of diabetic socks.  Docket 88-44.  Mr. Gard received another order for diabetic socks on January 2, 2014.  Docket 8-4.  He again received "extra-large" Wal-Mart socks instead of diabetic socks until May 5, 2014 when PA Hanvey specifically instructed the nurses to acquire "Dr. Comfort Men's extra-roomy socks for diabetic size 15EEEE."  Mr. Gard now receives the diabetic socks for which he received medical orders in March, 2010 and January, 2014.    Only in June, 2014 however, *after* Mr. Gard received his Dr. Comfort diabetic socks did he indicate to his medical providers that he believed the other socks caused swelling or any other problems with his legs or feet. Docket 88-71.  There is no indication that he *ever* told Ms. Namminga, the laundry supervisor, he believed the Wal-Mart extra-large socks caused any problems with his legs or feet.

Viewing the facts most favorably to Mr. Gard, there was a distinct lack of communication and coordination among DOC staff for issuing and executing medical orders regarding Mr. Gard's diabetic socks.  This confusion, however, at most evinces negligence, which is not sufficient to prevail on a claim of

70

deliberate indifference.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)
(prisoner must show more than gross negligence and more than disagreement
with treatment decisions).

The laundry supervisor at MDSP (Ms. Namminga) was the person who
dispensed Mr. Gard's socks until PA Hanvey directed the nurses to take charge
of his sock purchases.  Given Ms. Namminga's belief that Mr. Gard did not
have a current medical order for diabetic socks upon his return to MDSP in
2013, the court cannot conclude that she was deliberately indifferent to
Mr. Gard's medical needs.  See Harp v. Secretary of Corrections, 2013 WL
1896930  (D.S.D., May 6, 2013) (correctional officer not deliberately indifferent
for failing to obtain diabetic socks in the absence of a valid medical order).

As for the times when there was a valid medical order in place for
diabetic socks but Mr. Gard got the wrong socks, he still cannot prevail.  This
is so because even when there was a valid medical order in place for diabetic
socks, there is no evidence in the record suggesting any of the named medical
defendants or prison officials knew Mr. Gard's failure to have them "created an
excessive risk to the inmate's health and then failed to act on that knowledge.' "
Coleman, 114 F.3d at 785 (citing Long v. Nix, 86 F.3d 761, 765 (8th Cir.
1996)).

As to Mr. Gard's diabetic sock claim, the record before the court does not
support a finding that any defendant was subjectively aware there was an
excessive risk to Mr. Gard's health followed by a failure to act on that

71

knowledge.  Coleman, 114 F.3d at 785.  As such, Mr. Gard has not established his claim for deliberate indifference.  The defendants' summary judgment motion for qualified immunity on this claim should be granted because defendants were not "plainly incompetent" with regard to Mr. Gard's Eighth Amendment rights.  Hunter, 502 U.S. at 229.

### 3. Diabetic diet.

Mr. Gard asserts the defendants are deliberately indifferent because they do not provide him with a proper diabetic diet.  Docket 55, ¶¶ 57-75.  The facts which have emerged through the summary judgment proceedings, however, show Mr. Gard has consistently rebuffed the defendants' efforts to meet his dietary needs.

Mr. Gard refused a heart healthy diet, and even at his first meeting with the dietician resisted the idea of conforming to a diabetic diet.  Docket 88-60. Instead he wished to try to control his diabetes by "self-selection" on the regular diet tray.  Id.  From the very beginning he informed health services staff "he preferred the regular diet."  Docket 88-62; Appendix A.  When the kitchen staff reported in 2011 that Mr. Gard was still not picking up his diabetic trays,[30] the physician's assistant agreed to prescribe diabetic snack sacks twice

---

[30] Mr. Gard's affidavit generally claims the 2800 calorie consistent carb diabetic tray is "no different than any other diet" Docket 130, ¶ 17.  In a later paragraph of his affidavit, he stated he did not pick up his diabetic tray "because of the poor fare offered."  Id. at ¶ 19.  Mr. Gard did not provide the court with a specific comparison of what was on his diabetic diet tray

daily "to decrease his purchase of junk food from the commissary."  Docket 88-53.  Mr. Gard was disciplined for not picking up his diabetic tray, and admitted he did not pick up his diabetic tray because he did not think the kitchen staff "got it right."  Docket 88-17.  The court also takes judicial notice of an affidavit Mr. Gard filed in another case which is pending in this district, (Dale v. Dooley, et. al.) Civ. No. 14-4003, Docket No. 64-8, in which Mr. Gard averred that in January, 2013 he believed he was mistakenly given a bland tray instead of his 2800 calorie ADA consistent carb diet tray and after the kitchen worker replied "take a tray off the line or don't eat" he has "not picked up a single diet tray since then, even though my diet order is still current . . ."

Mr. Gard has offered nothing more than conclusory allegations that the diabetic diet tray is inadequate and does not conform to the 2800 calorie consistent carb goal set by Ms. Bemboom's plan.  Mr. Gard's sweeping condemnation of his diabetic diet trays is inadequate to create a genuine issue of material fact regarding their nutritional sufficiency.  Carter v. Washington Dept. of Corrections, 2013 WL 1090753 * 2 (W.D. Wash., Feb. 27, 2013) (inmate not a medical doctor or nutritionist and may not provide medical or expert opinion on whether Ramadan meals were, in fact, nutritionally adequate).

---

compared to the regular line tray for any extent of time.  If the two trays were the same there would be no reason to refuse the diabetic tray in favor of the regular tray.

Mr. Gard insisted he needed a third daily diabetic sack lunch with a meat (not peanut butter) sandwich in it, to prevent him from eating commissary items to supplement his meals.  Docket 88-68.  Though he admitted to his medical providers he often supplemented his meals with commissary items and ate items not on his diet because he could not control his hunger, Mr. Gard now asserts he only ate items designated as "healthful" on a handout he received from CBM food services, and sold or gave away the other items.

Mr. Gard's medical providers expressed doubt about Mr. Gard's claim that he did not eat all the commissary items he purchased, but acquiesced to his request for a third daily diabetic sack lunch.  Mr. Gard continues to receive three diabetic sack lunches per day in an effort to better control his diabetes.

Even after he began this lawsuit, Mr. Gard continued to refuse his diabetic diet tray.  See Appendix G (nursing note dated March 1, 2015, stating "dietary responded that pt. refusing tray and will just substitute for regular so they don't have to hear him complain about diet.").

In general, prisoners have a right to nutritionally adequate food.  Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992).  An inmate does not, however, have a right to food that is to his particular taste.  Burgin v. Nix, 899 F.2d 733, 734-35 (8th Cir. 1990).   See also Williams v. Berge, 102 Fed. Appx. 506 (7th Cir. 2004) ("prisoners have a right to adequate food, but not to food that is tasty or even appetizing.") (citations omitted).

74

Though the defendants' efforts have not eliminated Mr. Gard's diabetic problems, perfection is not the standard.  They need only have "responded reasonably to the risk, even if the harm ultimately was not averted."  Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998) (citation omitted).   Mr. Gard has failed to show the defendants  "knew of, yet disregarded, an *excessive* risk to [his] health."  Logan, 119 F.3d at 649.   This is especially true because Mr. Gard has consistently rebuffed the defendants' efforts to meet his dietary needs.  See Beck v. Skon, 253 F.3d 330, 333-34 (8th Cir. 2001) (defendants not deliberately indifferent where "prison officials have conscientiously attempted to meet [prisoner's medical needs and have continually been rebuffed by [prisoner's] refusal to comply with recommended treatment."); Long v. Nix, 86 F.3d 761 (8th Cir. 1996) (deliberate indifference claim rejected because "the record is full of evidence of the attempts of prison medical staff to evaluate Long's psychological problems and Long's refusal to cooperate.").

Alternatively, the defendants are entitled to qualified immunity on this portion of Mr. Gard's Eighth Amendment claim.  "To overcome qualified immunity, a plaintiff must be able to prove that 'every reasonable official would have understood that what his is doing violates' a constitutional right, and that the constitutional question was 'beyond debate.' " Story, 782 F.3d at 970 (quoting al-Kidd, 131 S. Ct. at 2083; Lane, 134 S. Ct. at 2383; Stanton, 134 S. Ct. at 7).  The evidence available to the defendants would not have alerted them that their behavior violated the Constitution.  Specifically, in light of their

75

efforts to control Mr. Gard's diabetes through modifications to his diet, and Mr. Gard's repeated the failure to cooperate with their efforts, no reasonable official would have understood that he or she was being deliberately indifferent to Mr. Gard's serious medical needs, thereby subjecting the defendants to § 1983 liability.  It is recommended to the district court that this portion of Mr. Gard's Eighth Amendment claim be dismissed on summary judgment.

### 4. Glasses.

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citations omitted).  A "serious" medical need has been described as  "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention" (Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)), and as "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway v. Coughlin, 37 F.3d 63, 66, 67 (2d Cir. 1994). Also, "only those deprivations denying the minimal civilized measures of life's 'necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Sieter, 501 U.S. 294, 298, (1991) (citations omitted).

Dr. Tornsey's note indicated Mr. Gard used his glasses "for reading and horse hair tying."  Docket 88-75.  Mr. Gard's  allegation that it took too long to

replace his reading glasses, or that once replaced, his reading glasses "did not fit his head" simply does  not rise to the level of deliberate indifference to a serious medical need as defined by the above cases.  Mr. Gard has not cited a case, and the court has found none, where ill-fitting glasses has been accepted as a "serious medical need."

While the line between "serious" and "not serious" is sometimes not an easy one to draw, the following are examples of conditions found to be non-serious:  kidney stones, chronic ankle arthritis, bunions, a toothache, and a broken finger.  The following are examples of conditions found to be serious: loss of an ear, untreated allergic reaction to penicillin, brain tumor, and failure to remove broken pins from a hip for over two years.  See cases cited in Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999).  Ill-fitting reading glasses fits better in the former category rather than the latter.

As to Mr. Gard's claim that the defendants were deliberately indifferent to his serious medical needs because they failed to timely replace his reading glasses with glasses that properly fit his head, the record before the court does not support a finding that any defendant was subjectively aware there was an excessive risk to Mr. Gard's health followed by a failure to act on that knowledge.   Coleman, 114 F.3d at 785.  As such, Mr. Gard has not established his claim for deliberate indifference.  The defendants' summary judgment motion for qualified immunity on this claim should be granted because

defendants were not "plainly incompetent" with regard to Mr. Gard's Eighth Amendment rights.  <u>Hunter</u>, 502 U.S. at 229.

## D.    Retaliation Claims

This analysis begins with the proposition that "[t]he prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."  <u>Adams v. Rice</u>, 40 F.3d 72, 74 (4th Cir. 1994).  Retaliation claims are "prone to abuse since prisoners can claim retaliation for every decision they dislike."  <u>Graham v. Henderson</u> 89 F.3d 75, 79 (2d Cir. 1996).  Courts must carefully scrutinize prisoner retaliation claims to insure "prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them[.]"  <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995).  An inmate who alleges retaliatory discipline faces a "significant burden."  <u>Id.</u> "Mere conclusory allegations of retaliation will not withstand a summary judgment challenge.  The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred."  <u>Id.</u>  (citation omitted, punctuation altered).

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the

prisoner's exercise of his constitutional right.' " Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007). See also Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009). "[B]oth the filing of [a] lawsuit and the filing of a grievance, are constitutionally protected activities." Owens v. Scott, 2010 WL 2594857 at *4 (W.D. Ark., June 21, 2010).

A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right. Haynes, 588 F.3d 1155.

To prevail on a claim of retaliation in violation of the First Amendment, the plaintiff must show (1) that he engaged in a protected activity, (2) that the government defendant took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013).

The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken. Haynes, 588 F.3d at 1156. The "but for" test applies to the defendants' motive, not to causation. Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012). The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Beaulieu, 690 F.3d at 1025.

79

In Beaulieu, the plaintiff had nine behavioral infractions in the month before his transfer.  A transfer was appropriate to address his behavioral problems, so he failed to prove exercising his constitutional right was the "but for" cause. Beaulieu, 690 F.3d at 1026-27.

Where the disciplinary action occurs "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation.  Haynes, 588 F.3d at 1156-57.  A span of three days between the alleged retaliation and the plaintiff's exercise of his constitutional rights was a sufficiently close nexus in time to preclude summary judgment.  Santiago, 707 F.3d at 993.  Where the allegedly retaliatory action occurs *before* a defendant knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate.  Beaulieu, 690 F.3d at 1025-26.

Courts have refused to find retaliation if the prisoner fails to present evidence showing the particular defendant who is alleged to have taken the retaliatory action was aware of, or was affected by, the prisoner's earlier constitutionally protected activity from which retaliatory animus could be inferred.  See Hale v. Williams, 390 Fed. Appx. 351, 352 (5th Cir. 2010).  In Hale, the court dismissed the prisoner's retaliation claim on summary judgment.  Id.  The prisoner claimed his shop privileges were revoked in retaliation for his grievances against a prison guard.  Id.  The court dismissed his retaliation lawsuit, however, because it noted Mr. Hale failed to show the

80

named defendant was "even aware" of his complaint against the guard at the time of the alleged retaliation.  Id.

Similarly, in Bibbs v. Early, 541 F.3d 267 (5th Cir. 2008) the plaintiff's lawsuit alleged the collective defendants retaliated against him for filing prison grievances.  Id. at 268.  He moved to amend his complaint to add additional defendants.  Id. at 274-75.  The Fifth Circuit affirmed the trial court's denial of the proposed amendment as futile, because Mr. Bibbs did not allege the proposed new defendants "were aware of his having previously exercised a constitutional right; he thus failed to adduce evidence of a chronology of events of retaliation from which retaliation could be inferred."  Id. at 274-75.

Finally, in Atkinson v. Bohn, 91 F.3d 1127 (8th Cir. 1996), the inmate plaintiff sued his prison psychologist and counselor for subjecting him to punishment in retaliation for filing an earlier lawsuit.  Id. at 1128.  The Eighth Circuit affirmed dismissal of the case, however, because    Mr. Atkinson did not affirmatively show "defendants were involved in or affected by his previous litigation, and failed to allege sufficient facts upon which a retaliatory animus could be inferred."  Id. at 1129.

In Meuir, the plaintiff had bleeding gums and toothaches for which he sought medicated mouthwash.  Meuir, 487 F.3d at 1117.  Defendants refused to provide the mouthwash, but instead gave him Tylenol and urged him to rinse his mouth with salt water.  Id.  After plaintiff's dental complaints continued, a visit to an outside dentist was scheduled; however, fearing that

the dentist would pull all his teeth, the plaintiff refused to go.  Id. at 1117-18.

Thereafter, the jail officials refused to give the plaintiff free Tylenol for his

toothaches, although the plaintiff could still obtain Tylenol from the

commissary at his own expense.  Id. at 1118.  The plaintiff brought suit,

alleging retaliatory discipline.  Id.  The case was dismissed on defendant's

rationale that plaintiff's refusal to go to the dentist convinced defendants that

his dental condition was not that serious after all.  Id. at 1119.

In Haynes, a prisoner filed a grievance against a prison employee alleging

the employee cursed at the prisoner and threatened him.  Haynes, 588 F.3d at

1155.  The employee responded by filing a disciplinary charge against the

prisoner, alleging that the prisoner had filed a grievance on false charges.  Id.

This prompted prison officials to transfer the prisoner from his normal cell to a

mosquito-infested, hot and humid cell where he received reduced shower and

exercise privileges and could not visit the prison library.  Id.  The prisoner then

filed a retaliatory discipline claim in court.  Id.  Defendants in the lawsuit

argued that transfers to different cells did not constitute discipline, negating

the second element of the *prima facie* case.  Id.  The court held that the filing of

the disciplinary charge itself was sufficient to satisfy the second element.  Id. at

1156.

In Cornell v. Woods, 69 F.3d 1383, 1386-88 (8th Cir. 1995), prison

officials filed a disciplinary charge against a prisoner and the prisoner was

transferred to a higher-security prison after he had cooperated with an internal

affairs investigation at his prison implicating a prison guard.  The prisoner then brought suit under § 1983 alleging that the defendants had disciplined him in retaliation for exercising his constitutional right to cooperate with the IA investigation.  Id. at 1387.  Although the court acknowledged prisoners have no right to remain in a particular prison, and that prison officials may transfer a prisoner for any reason or no reason, the court held that defendants could not transfer a prisoner in retaliation for exercising a constitutional right.  Id. at 1387-88.  The court held that the plaintiff had a constitutional right to cooperate with the internal prison investigation.  Id. at 1388.  If the cooperation in the investigation was the "but for" reason for the plaintiff's transfer to the more-secure prison, plaintiff made out a *prima facie* case of retaliatory discipline.  Id. at 1388-89.  If, however, the discipline or transfer was made because of "an actual violation of prison rules or regulations," the retaliatory discipline claim fails.  Id. at 1389; Santiago, 707 F.3d at 993.

The sufficiency of Mr. Gard's retaliation claims are examined with this background in mind.  Mr. Gard's retaliation claim against Leland Tjeerdsma fails because no retaliatory action actually occurred.  Mr. Gard has therefore failed to establish the second element of a prima facie retaliation case.  Haynes, 588 F.3d 1155.

Mr. Gard's claim against Tammy DeJong for removing fruit from his cell likewise fails.  The defendants explained that although Mr. Gard may eat his diabetic snacks on the day they are distributed to him, he has been instructed

83

to store them (or at least the perishable parts of them such as fruit) properly, outside his cell.  For security reasons, inmates are not allowed to store fruit in their cells.  Mr. Gard's filing of grievances, therefore, was not the "but for" reason Ms. DeJong confiscated the items from his cell and this retaliation claim fails.  <u>Beaulieu</u>, 690 F.3d at 1026-27.

Mr. Gard's claim that Ms. DeJong retaliated against him by removing his tinted safety glasses from his room also fails.  Ms. DeJong explained that she checked the Comprehensive Management System (COMS) before she removed the tinted glasses from Mr. Gard's possession.  She found he did not have a current medical order for them, so she contacted MDSP health services, who also told her there was no current medical order.  She knew Mr. Gard was no longer employed as a welder, so she removed the glasses but informed Mr. Gard he needed to renew the medical order.  Without a current medical order for tinted glasses Mr. Gard is not authorized to possess them.  Mr. Gard cannot show, therefore, that "but for" a retaliatory motive, Ms. DeJong would not have removed the tinted glasses from his possession.  <u>Beaulieu</u>, 690 F.3d at 1026-27.

Next, Mr. Gard asserts the defendants generally retaliated against him by rejecting or denying his grievances.  But the rejection forms provided by the defendants (Dockets 88-24 through 88-27) each indicate the reason Mr. Gard's various grievances were rejected or denied.  For example, one form instructs Mr. Gard his grievance was rejected or denied because he addressed too many

84

issues in his grievance and failed to state a claim or request an action (Docket 88-24). Another instructed him that his grievance was rejected because his request that officials "remedy ongoing constitutional violations" was not specific enough for them to act upon (Docket 88-26). A third grievance was rejected because he again addressed multiple issues in his grievance (Docket 88-27). Again, therefore, Mr. Gard has failed to show that but for the defendants' retaliatory motive, his grievances would not have been rejected and his retaliation claim therefore fails. Beaulieu, 690 F.3d at 1026-27.

Mr. Gard claims the defendants retaliated against him for filing a grievance about expired items he received from the commissary. He admits, however, that he told the defendants he gave one of the expired items away to another inmate, which is a violation of prison policy. Mr. Gard cannot, therefore, show a retaliatory motive was the but for cause for the disciplinary act. Beaulieu, 690 F.3d at 1026-27.

The defendants have produced evidence which shows Mr. Gard was not on the attorney visit list during the week he was in the SHU, when he claims the defendants retaliated against him because they failed to call him for his attorney visit. Docket 88-29. In his affidavit, Mr. Gard asserts he did sign up for an attorney visit but was "obviously" taken off the list. This conclusory allegation, without more, is not enough to show the second element of a prima facie case of retaliation under Lujan, 497 U.S. at 888; Haynes, 588 F.3d 1155.

85

Next, Mr. Gard alleged in his amended complaint that several of the named defendants (Stevens, DeJong, Susan Jacobs, Corporal Cropper) retaliated against him by delaying the return of his property after his time in the SHU.  At the summary judgment stage, however, the evidence submitted suffers from several shortfalls.  By Mr. Gard's own admission, he declined Officer Stevens' invitation to report to the property office to sort through his belongings to determine whether his property fit into three boxes.  Docket 55, ¶ 103.  Though there is a dispute about whether the policy in place allowed three boxes total or three boxes plus legal materials, that dispute is not material to the retaliation claim.  Mr. Gard's claim is that defendants retaliated against him by delaying the return of his property.  But because Mr. Gard chose not to report to the property office but instead admits he "told Tjeerdsma that Stevens could keep my property over there and I would take care of the problem in another manner," Mr. Tjeerdsma and Mr. Stevens' retaliatory motive, if any, cannot be the but for cause of the delay.  See Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004) (summary judgment granted in favor of defendants on a retaliation claim when "the only evidence [plaintiff] presented suggests his own conduct may have caused the denial of privileges."). Additionally, neither Leland Tjeersdma, Randy Stevens, nor Corporal Cropper (the final individual whom Mr. Gard claims delayed the return of his property) were named in Mr. Gard's original compliant.  Nor has Mr. Gard averred that he had filed previous grievances against any of these individuals.  Mr. Gard has

failed to produce  sufficient facts "upon which a retaliatory animus could be inferred." Atkinson, 91 F.3d at 1129.

Officer Stevens' delay in delivering a book Mr. Gard ordered likewise cannot be attributed to retaliatory animus.  Mr. Stevens was not named in the original complaint and there is no evidence Mr. Gard filed grievances against Officer Stevens before the books were withheld.  As such,  Mr. Gard has failed to produce sufficient facts "upon which a retaliatory animus could be inferred." Atkinson, 91 F.3d at 1129.  Additionally, Mr. Stevens mistakenly believed the books could not be purchased with money from outside bank accounts, but delivered the books when he realized his mistake.  The length of the delay was nineteen days.  Even assuming a retaliatory animus, a one-time, nineteen-day delay in receiving books would not "chill a person of ordinary firmness from continuing" in pursuing his constitutionally protected right.  Santiago, 707 F.3d at 991.[31]

Finally, Mr. Gard asserts that since he began his lawsuit, he has only been allowed to review his medical records once per quarter (but after he grieved that decision, he was allowed to review the records once per week). Defendant Tolsma explains in her affidavit that Mr. Gard's requests to review

---

[31]     Indeed, Mr. Gard was not chilled.  He filed two more civil lawsuits in federal court after the book delay incident.  See Gard v. Dooley, Civ. No. 14-4179 (filed December 8, 2014); Gard v. Dooley, Civ. No. 14-4183 (filed December 11, 2014).

records frequently followed negative interactions with his health care providers, and were beginning to interfere with the providers' ability to properly execute their duties.  The decision was made, therefore, to put a limit on the frequency of Mr. Gard's record reviews.  Docket 88-7, ¶ 55-56.  Mr. Gard cannot, therefore, show a retaliatory motive was the "but for" cause for the disciplinary act.  Beaulieu, 690 F.3d at 1026-27.  Additionally, the court notes that Mr. Gard was not precluded from viewing his records altogether, but rather a reasonable limitation was placed on his ability to view them.  Most people in the free world probably rarely, if ever, review their medical records. A reasonable limitation on the number of times an inmate can view his medical records would not "chill a person of ordinary firmness from continuing" in pursuing his constitutionally protected right.  Santiago, 707 F.3d at 991.[32]

Here, as in Meuir, defendants have articulated in each instance cited by Mr. Gard as retaliation, neutral business reason for their actions.  See also Beaulieu, 690 F.3d at 1026-27 (summary judgment granted where defendants' transfer of plaintiff was preceded by multiple disciplinary infractions in the period immediately prior to the transfer).  In each instance, Mr. Gard has not adduced sufficient evidence to show the reasons articulated by defendants are mere pretext for illegal retaliation.

---

[32] See footnote 31, supra.

88

To determine whether qualified immunity applies, the plaintiff must make out a violation of a constitutional right. <u>Saucier</u>, 533 U.S. at 201. If the court finds that plaintiff has failed to do so, qualified immunity applies. <u>Pearson</u>, 555 U.S. at 236. For the reasons articulated above, the court finds each of Mr. Gard's retaliation claims fail to set forth a violation of a constitutional right. The defendants' summary judgment motion for qualified immunity on this claim should be granted because defendants were not "plainly incompetent" with regard to Mr. Gard's right to be free from disciplinary sanction in retaliation for exercising his constitutional rights. <u>Hunter</u>, 502 U.S. at 229. The court recommends granting defendants' summary judgment motion as to each of Mr. Gard's retaliation claims.

## CONCLUSION AND RECOMMENDATION

This magistrate judge respectfully recommends that defendants' motion for summary judgment [Docket No. 86] be granted in its entirety and each of plaintiff Rex Gard's claims which is based upon 42 U.S.C. § 1983 be dismissed with prejudice. Mr. Gard's claims which are based upon the Americans With Disabilities Act are unaffected by this Report and Recommendation.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely

89

objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the

District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>,

781 F.2d 665 (8th Cir. 1986).

DATED this 4th day of March, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge